589 So.2d 1173 (1991)
Debra GLASPER and William Smith
v.
Todd HENRY, New Orleans Police Department, City of New Orleans, Dr. Robert E. Treuting, Dr. M.G. Simpson, Drs. Treuting, Simpson and Associates d/b/a The Pathology Laboratory, a Professional Medical Corporation and St. Paul Fire and Marine Insurance Company.
No. 90-CA-2011.
Court of Appeal of Louisiana, Fourth Circuit.
November 14, 1991.
*1174 Benjamin J. Birdsall, Jr., Birdsall, Rodriguez & Kehoe, New Orleans, for plaintiffs/appellants.
Bruce G. Whittaker, Deputy City Atty., Val K. Scheurich, III, Deputy City Atty., Kathy Torregano, Chief Deputy City Atty., William D. Aaron, City Atty., New Orleans, for defendants/appellants.
Before BARRY, BYRNES and PLOTKIN, JJ.
BARRY, Judge.
The City of New Orleans and Officer Todd Henry appeal a judgment in favor of Debra Glasper and William Smith for personal injuries which resulted after a multi-automobile accident on the interstate highway.
According to the police report, three vehicles were involved in the collision: a 1987 white Ford (NOPD marked unit) driven by Officer Henry with Officer Evans as a passenger; a 1965 green Chevrolet driven by William Smith (owner Barbara Young) with Debra Glasper as a passenger; and a 1979 yellow Cadillac driven by Drew Moisant (owner Lucille Moisant) with Kelly Giacobbe as a passenger. Bruce Sanders, a witness, claimed that a 1986 red Cadillac, later determined to belong to Treuting & Simpson & Associates, d/b/a The Pathology Laboratory, caused the accident but left the scene.
Smith and Glasper sued Officer Henry, the City of New Orleans, Dr. Robert Treuting (whose wife was driving the red Cadillac), Dr. M.G. Simpson, Treuting & Simpson & Associates, and St. Paul Fire & Marine Insurance Company. After a bench *1175 trial judgment was rendered against the City of New Orleans.

Smith was awarded:
General damages: $100,000.00
Medicals: 3,519.66
Lost wages: 4,000.00
 -----------
 $107,510.66
Glasper was awarded:
General damages: $200,000.00
Medicals: 17,126.57
Lost wages: 18,000.00
 ___________
 $235,126.57

Charity Hospital was awarded $1,921.70 and expert fees of $1,450 were set. The trial court granted plaintiffs' motion for a partial new trial and cast Officer Henry and the City of New Orleans. Charity Hospital's award was not included in the amended judgment.
On appeal, the City and Officer Henry argue that Officer Henry was not solely at fault; alternatively, that the awards are excessive.

TESTIMONY
Officer Guggenheim arrived at the accident scene (Interstate 10 between Tulane Ave. on-ramp and Orleans Ave. exit) about 8:30 p.m. on December 21, 1987. The vehicles had been moved before she arrived. Officer Guggenheim's report indicates that the entire front of the NOPD Ford was slightly damaged and the front and the rear of the Chevrolet (Smith and Glasper) was heavily damaged. The right side and rear of the yellow Cadillac (Moisant and Giacobbe) was lightly damaged.
The police report reflects the following information from the drivers' statements. Officer Henry was responding to a "108" (officer needs assistance) with lights and siren when Smith's Chevrolet "suddenly swerved in front...." Moisant (yellow Cadillac) saw a red Cadillac enter I-10 at Canal St. (later clarified to mean Tulane Ave.) and straddle the right lane and shoulder at a slow speed. Moisant stated: "The Cadallic [sic] was driving very reckless [sic] as he [Moisant] ... passed him." Moisant told the officer the Chevrolet began "to swerve and a vehicle hit him. However, he was not sure which vehicle hit him." Officer Guggenheim's supplemental report indicates that Smith (Chevrolet), who was contacted after the accident, observed a red Cadillac "going from the merge lane into the left and middle lane." Smith stated that he "is not sure what hit his vehicle first, but he lost control of his vehicle when he began to spin. While Smith is not sure exactly what happened[,] he is sure that the entire accident was caused by the Cadillac."
Officer Guggenheim testified that the information about the red Cadillac, license 215N474, was received from Officer Thompson who interviewed Bruce Sanders, a witness. Officer Guggenheim's December 22, 1987 interview with Sanders was included in her supplemental report. Sanders, who was driving a Toyota, stated he was on I-10 when he saw a red or orange Cadillac try to enter the traffic flow from an on-ramp. The Cadillac swerved from the entry lane to the outside lane, accelerated then decelerated, and stopped. Sanders passed the red Cadillac and looked into his rear view mirror and saw a light colored Cadillac "coming up behind him at a high rate of speed." Sanders "gunned his vehicle" to avoid being hit, then realized an accident had occurred behind him. He got the license number of the red Cadillac because he was "firm in his belief" that the red Cadillac caused the accident. He did not know what other vehicle was involved.
Sanders died prior to trial. The police report (and supplemental) containing his statement was introduced over objection.
Patricia Treuting, driver of the red Cadillac, testified that she and her cousin were in the right lane in order to exit at Orleans Ave. She said the road was wet and slick and traffic was moderate to heavy. She was driving very slowly because of the weather, the presence of the merging lanes and the approaching exit.
Dr. Treuting testified that his office was notified December 22, 1987 that the red Cadillac owned by his firm had been involved in a hit and run accident. He and Officer Guggenheim went to the French Quarter parking lot where Mrs. Treuting *1176 left the car overnight. Dr. Treuting said the car was not damaged, but Officer Guggenheim did not recall if the car had damage.
Officer Henry testified that he and Officer Evans received a "108" and they entered I-10 at Tulane heading east. The flashing light on his marked car did not function and he did not use the siren. He entered the outside lane and drove through the center lane to the inside lane because traffic was moving rapidly. He was driving 40-45 m.p.h. and the rain was moderate.
Officer Henry saw traffic in the outside lane slow down and the center lane traffic was almost stopped. He saw the Chevrolet (Smith) in the center lane apply its brakes, then hit the light colored Cadillac. The Chevrolet's rear end slid into the left lane at an angle. Officer Henry's vehicle which was three or four feet behind, struck the Chevrolet and knocked it through the center and outside lanes into the guardrail. Officer Henry did not move his vehicle, which was damaged on the right front and side. He did not see a Toyota or red Cadillac, but heard about the red Cadillac.
During cross-examination Officer Henry could not explain why the police report indicated that his lights and siren were on. When confronted with his deposition testimony that he was traveling three feet behind the Chevrolet (which he said was in the center lane) when he struck the Cadillac, the officer stated his vehicle was in the inside lane and the Chevrolet was three feet ahead in the center lane on an angle.[1] The Chevrolet fishtailed into the left lane and his car was about three feet from the Chevrolet's bumper prior to impact.
Officer Evans, who was with Officer Henry, testified that the Chevrolet swerved into their lane and their car hit the back of the Chevrolet. He did not recall why the police car's lights and siren were not utilized. The interstate was wet and traffic was moderate. He claimed the Chevrolet appeared about a second or so before impact when it swerved into their lane. He did not see the Chevrolet hit the Cadillac prior to the police car's collision with the Chevrolet.
William Smith, an off-duty RTA bus driver, was driving the green Chevrolet and Debra Glasper was a passenger. He testified that it was dark, raining and traffic was moderate to heavy. His headlights and windshield wipers were on and he was traveling about 35 m.p.h. in the center lane.
Smith saw a police car on the inside lane with its red and blue lights flashing, but no siren. Traffic was lighter on the inside lane. He noticed the traffic slowing down and the car in front of him (which he could not identify) slowed almost to a stop. Smith said the police car pulled into the center lane behind him and struck his vehicle. Smith stated there was another impact to the left side of his car, but he did not know the source. He was knocked out of the car and rendered unconscious.
On cross-examination Smith said that he was involved in a prior automobile accident and injured his left leg. He also admitted being in an accident when his RTA bus ran into a tree. His employee file shows that he was fired as a bus driver on February 10, 1989 because of three preventable accidents within 12 months. In his January, 1990 deposition he denied being in an accident after the December 21, 1987 accident in this litigation.
Debra Glasper, Smith's passenger, testified that Smith's Chevrolet was struck from behind, then there was a second impact on the side. She was also thrown from the car and rendered unconscious. She could not identify the car in front of Smith's vehicle. She said traffic in the middle and outside lanes was slowing and there was less traffic on the inside lane. Smith slowed down before impact, but she did not know if a police car was in the left *1177 lane. When asked if a police car hit Smith's vehicle, she stated that before impact she could see the red and blue lights of a police car. After impact, a witness told her that a police car was involved.
Drew Moisant, who was driving a yellow Cadillac, testified that it was raining, traffic was medium, and he was in the outside lane. He said a red Cadillac entered the interstate from the Tulane Ave. ramp and was traveling erratically, about 10-15 m.p.h., between the outside lane and the shoulder. Traffic was moving at a normal speed. The red Cadillac swerved onto the shoulder four or five times. A white Toyota pickup (in front of Moisant) approached the red Cadillac and had to move into the center lane to avoid a collision.
Moisant estimated that he had 30-35 feet to stop before he would hit the red Cadillac and he managed to stop within 10 feet. Moisant confirmed his deposition testimony that the other cars had difficulty stopping because the red Cadillac "cut everyone off." Moisant clearly believed the red Cadillac caused the accident and left the scene. Moisant's car was hit from behind but he did not see the vehicle that struck him. After the collision he saw the Chevrolet on the shoulder of the road and a police car in the center lane.
Kelly Giacobbe was a passenger in Moisant's vehicle. She said a red Cadillac was slowly weaving in and out of the heavy traffic in the right lane. It was her opinion that the red Cadillac caused the truck and the yellow Cadillac to stop abruptly. The yellow Cadillac was hit from the rear by the Chevrolet, but she did not know which vehicle hit the Chevrolet.
Giacobbe testified that Moisant told her "that a police car ... had struck the car that had struck us." She said Moisant "didn't specify" the sequence of impacts. On cross-examination she again stated that Moisant did not indicate a sequence of the impacts.

THE CAUSE OF THE ACCIDENT
The witnesses presented conflicting testimony as to which lane the various impacts occurred, the sequence of the impacts, and what role the red Cadillac played in the accidents.
Officers Henry and Evans said their collision with the Chevrolet was on the inside lane. Smith and Glasper said the accident occurred in the center lane. Moisant and Giacobbe testified their yellow Cadillac was in the right lane when it was rear-ended, but Moisant saw the police car in the center lane after the accident. There were discrepancies between the drivers' statements to Officer Guggenheim and their testimony at trial.
The trial court relied on the testimony of Moisant, the only impartial witness, and concluded that the police car caused the accident. In reasons for judgment the court states:
Mr. [sic] Treuting's erratic driving was not a cause in fact of the accident. Traffic was braking in front of plaintiffs for a considerable distance. Plaintiffs, slowing in response to this traffic, were struck in the rear by the police vehicle. Drew Moisant, the only impartial witness, was quite certain that the Nova, the police car and the impact were in the center lane. The City is solely responsible.
When there is a conflict in testimony, the trial court's reasonable evaluations of credibility and inferences of fact should not be disturbed unless they are clearly wrong or manifestly erroneous. If the trial court's findings are reasonable in light of the entire record, an appellate court may not reverse even though it is convinced that it would have weighed the evidence differently had it been the trier of fact. When findings are based on determinations as to the credibility of witnesses, the standard demands great deference to the trier of fact's findings. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring, 283 So.2d 716 (La.1973). Where the trial court's "finding is based on a decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989).
*1178 The Rosell court noted that manifest error can be found in a credibility call when documents or objective evidence so contradict the witness' story or the story is internally inconsistent or implausible on its face. 549 So.2d at 845. That situation does not exist here.
The conflicting testimony is impossible for this Court to reconcile. We are bound to give deference to the trial court's findings regarding credibility. The lower court's determination of liability is affirmed.

EXCESSIVE AWARD
Appellants argue that the general damage awards to Smith and Glasper should be reduced, and Glasper's award for lost wages is excessive.
An appellate court should not disturb an award unless the record shows that the trier of fact abused its much discretion. The question is whether the award is reasonably supported by the evidence. Bitoun v. Landry, 302 So.2d 278 (La.1974); Amedee v. Cruse, 526 So.2d 433 (La.App. 4th Cir.1988).
If an appellate court finds an abuse of discretion, then it can review prior cases to determine an appropriate award. The appellate court may lower the award to the highest point or raise the award to the lowest point which is reasonable. Reck v. Stevens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, 341 So.2d 332 (La. 1976); Bernard v. Royal Insurance Company, 586 So.2d 607 (La.App. 4th Cir.1991); Runnels v. Esteves, 550 So.2d 1225 (La. App. 4th Cir.1989), writ denied 558 So.2d 1126 (La.1990).

SMITH
Smith testified that he was thrown from his car and an ambulance took him to Charity Hospital. He was released after midnight. He saw Dr. Kewalramani within a week and for months thereafter. Some tests were very painful. Smith continued to have pain in his head, neck, leg and back after he was discharged. He has no feeling on the left side of his head.
Dr. Kewalramani, orthopedist, first saw Smith on December 29, 1987. He diagnosed: a closed head injury shown by scalp contusions with a fracture of the supraorbital plate; musculoligamentous trauma to the lumbar region; and multiple soft tissue contusions with a laceration along the left leg and contusions along the right leg. He prescribed a muscle relaxant and an anti-inflammatory agent. He concluded that Smith was temporarily totally disabled.
Dr. Kewalramani saw Smith on January 5, 1988 and January 14, 1988. On January 29, 1988 Smith complained of cervical pain and there was a spasm of the paraspinal muscles in the neck. Smith's back and neck complaints slowly improved. By March 28, 1988 Dr. Kewalramani said Smith was able to return to work.
On June 14, 1988 electrodiagnostic tests showed a disc herniation at L4-5. A nerve conduction study showed borderline change in the latency of the posterior tibial nerve. After several visits Dr. Kewalramani reduced the medication to "as needed." On November 2, 1988 Dr. Kewalramani discharged Smith.
Smith returned to Dr. Kewalramani on December 27, 1989 and on January 5, 1990 MRI (magnetic resonance imaging) films showed a bulging intervertebral disc at L5-S1 posteriorly and minimal bulging at L4-5. The doctor stated that Smith (28 years-old) would experience pain with physical activities and have certain limitations. Continuous sitting would also aggravate the condition. Dr. Kewalramani assigned a 15% disability of the entire body.
Dr. Vogel, neurosurgeon, saw Smith on April 19, 1988 to evaluate for cervical lumbosacral pain. He diagnosed a resolving acute cervical and lumbosacral strain and recommended that Smith return to Dr. Kewalramani for conservative care. Dr. Vogel saw Smith on June 23, 1988 and January 4, 1990. Smith's December 18, 1989 lumbar MRI revealed a herniation of the lumbar disc plus degeneration of that disc, which had been controlled by Dr. Kewalramani. Dr. Vogel's diagnosis was that Smith had a bulging disc which caused *1179 compression of the nerve root and sciatic pain. Smith's last visit was on January 25, 1990 and Dr. Vogel made the same recommendations.
Dr. Vogel could not estimate whether the bulging disc would worsen. However, he did say that Smith would experience deterioration that would accelerate due to the injury. He stated there was no way to determine if Smith would need surgery, but that possibility existed.

GLASPER
Glasper testified that she was thrown from Smith's car and taken to Charity Hospital where her right leg was placed in a hip to foot cast. She said the electromyography and cervical facet arthrogram were painful procedures. She was hospitalized to undergo a neurotomy (a machine malfunction necessitated two procedures). She had leg pain at the time of trial.
Dr. Kewalramani testified that he first saw Glasper on December 29, 1987 and she had an above knee long leg plaster cast on the right side. He felt that she sustained a closed-head injury post-concussion syndrome, a musculoligamentous injury to the cervical and lumbar region, and a fracture of the right tibia and fibula.
Dr. Kewalramani saw her on January 14 and 28, 1988. The plaster cast was removed and she had tenderness in the knee joint. After additional visits, on May 5, 1988 she complained of tingling and numbness but nerve conduction studies were normal. Electromyography showed abnormalities in paraspinal muscles suggestive of spasm in the lumbar region. She continued therapy at home as well and was on medication. She improved and was discharged on September 15, 1988. Dr. Kewalramani found a 15% lower extremity disability.
Glasper returned to Dr. Kewalramani on July 7, 1989 and complained of neck and right knee pain. A visit in December, 1989 also related to neck and right knee pain. Dr. Vogel was treating her during that period.
Dr. Vogel testified that he first saw Glasper on October 27, 1988 on a referral by Dr. Kewalramani. According to her history she experienced a grade three concussion and a fracture of the tibia. She had chronic cervical and lumbosacral strain, but resumed normal activities as a student in July, 1988. She continued to have lumbosacral and cervical pain as well as headaches and right lower leg pain.
A November 3, 1988 CAT (computer assisted tomography) scan was normal, but Glasper complained of cervical and left shoulder pain at a December 6, 1988 visit. Her neurological exam was normal except for focal muscle spasm in the left lumbosacral and left cervical region. Dr. Vogel recommended continuing physical therapy and symptomatic medication. He saw her on October 10, 1989 after a spontaneous flare-up of pain. The examination was normal except for a mild limitation of motion with mild muscle spasm on the left in the cervical region. He recommended a cervical facet arthrogram to determine if the joints or facets were causing pain because of cervical instability. The arthrogram on the left side was normal. Dr. Vogel saw her on November 7, 1989 and she had a mild spasm on the left side. By January 4, 1990 there was mild muscle spasm bilaterally. A cervical facet arthrogram and block on her right side (on January 16, 1990) indicated cervical instability.
Glasper had a cervical medial branch neurotomy on March 5, 1990, but it did not relieve the instability at three of the four facet joints in her cervical spine. She had pain at the time of trial (two weeks after the operation). The doctor could not state whether she would require a fusion or whether the neurotomy was a success.
Dr. Gottsegen, thoracic and cardiovascular surgeon, saw Glasper for the first time on May 26, 1988 because of pain and numbness in her left arm. He concluded there was an indication of vascular compromise but it was not significant. After a Doplar assessment and thermography, Dr. Gottsegen concluded there was evidence of vascular compression at the thoracic outlet on the left side, but the findings were equivocal. *1180 After several more visits, on January 8, 1990 Glasper's examination was essentially normal.

ANALYSIS
Appellants argue that the general damage awards of $100,000 to Smith and $200,000 to Glasper are excessive. They contend that Glasper's award for lost wages is based on a job she never sought and for which availability was never proven.
As to Smith, the reasons for judgment specify:
William Smith is a 28 year old bus driver, who has a traumatically induced bulging disc, and permanent numbness over his left forehead and upward onto the crown of his head. A cervical strain has resolved. He fractured the supra orbital plate and had generalized bruises. His back does not now require surgery, but the natural degenerative process will be hastened....
General damages do not have a common denominator and are determined on a case by case basis. Bernard v. Royal Insurance Co., 586 So.2d 607 (La.App. 4th Cir.1991). They involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors which affect the victim's life. Boswell v. Roy O. Martin Lumber Company, 363 So.2d 506 (La. 1978); Prothro v. Dillahunty, 488 So.2d 1163 (La.App.2d Cir.1986). Factors to be considered in assessing quantum for pain and suffering are severity and duration. La.C.C. Art. 1999; Miller v. Winn Dixie Stores, Inc., 527 So.2d 989 (La.App. 3rd Cir.1988), writ denied 531 So.2d 763 (La. 1988).
The detailed testimony from Drs. Kewalramani and Vogel as to Smith's injuries and pain support the $100,000 award.
As to Glasper, the reasons for judgment specify:
Debra Glasper fractured her right lower leg. The fracture ran through the tibial plateau, or into the weight bearing joint and she will develop arthritis. She developed a thoracic outlet compression syndrome which resolved by January 8, 1990. She suffered neck and back sprains. The back resolved, the neck did not and was eventually diagnosed as facet joint instability. Two weeks ago Dr. Vogel performed a neurotomy at three levels from which she is now recovering. Her neck will reach maximum cure in 12-18 additional months. Her prognosis is unclear, but Dr. Vogel, basing his optimism on statistical probability rather than this patient, gives her a 90% chance of relief from 80-90% of her neck pain. Her leg will more likely than not hurt for the rest of her life....
Considering the extensive testimony of Drs. Kewalramani, Vogel and Gottsegen, the tests and surgical procedures, and her continuing pain, we find the $200,000 award is not excessive.
The award to Glasper for lost wages (a starting beautician's salary of $9,000 to $10,000 per year) was based on the testimony of Loretta Moore, owner of the cosmetology school which Glasper attended. Glasper would have finished the beautician's course in June, 1988 if she had not been injured and the award is based on two years of salary. She completed the course at a later date, but was unable to stand for an extended time.
The trial court considered that Glasper would not have a permanent loss of income because she enrolled in a legal-medical secretarial course. The award is reasonable under those circumstances.
The judgment is affirmed.
AFFIRMED.
NOTES
[1] In deposition testimony Officer Henry stated his vehicle was about three feet from an imaginary line drawn across the inside lane from the back bumper of the Chevrolet in the center lane. The officer testified that the Chevrolet swerved directly in front of him. He nodded affirmatively when asked if his vehicle was three feet behind the Chevrolet's bumper when it hit the Cadillac.