16-463

JASMINE JONES

VERSUS

PROGRESSIVE SECURITY INSURANCE CO., ET AL.

**\*\*\*\*\*\*\*\*\***
**APPEAL FROM THE**
**NINTH JUDICIAL DISTRICT COURT**
**PARISH OF RAPIDES, DOCKET NO. 249,616**
**HONORABLE MONIQUE RAULS, PRESIDING**
**\*\*\*\*\*\*\*\*\***

**SYLVIA R. COOKS**
**JUDGE**

**\*\*\*\*\*\*\*\*\***

Court composed of Sylvia R. Cooks, John D. Saunders, and Shannon J. Gremillion Judges.

**Reversed. Judgment Rendered. Remanded in part with instructions**.

**Philip G. Hunter**
**Hunter & Beck**
**1916 Gus Kaplan Drive**
**Alexandria, LA 71301**
**(318) 487-1997**
**ATTORNEY FOR PLAINTIFF/APPELLANT:**
 **Jasmine Jones**

**Ryan M. Malone**
**Duplass, Zwain, Bourgeois,**
**Pfister & Weinstock**
**Three Lakeway Center, Suite 2900**
**3838 North Causeway Boulevard**
**Metairie, LA 70002**
**(504) 832-3700**
**ATTORNEY FOR DEFENDANTS/APPELLEES:**
 **Volvo Construction Equipment Rents, Inc.,**
 **Liberty Mutual Fire Insurance Company and Keith Morgan.**

**COOKS, Judge.**

## FACTS AND PROCEDURAL HISTORY

In this automobile accident case Defendants admit liability. Jasmine Jones (Jones) and Keith Morgan (Morgan) were stopped at a traffic light waiting for the light to switch to green. Morgan was driving a Ford F-150 pickup truck, sitting in the right lane of travel, and Jones was driving a Honda automobile, sitting in the left lane of travel. When the light changed from red to green both vehicles proceeded. Jones headed straight through the intersection in the left lane of travel but Morgan tried to make a left turn from his lane and struck Jones' vehicle on the right front tire. Jones' vehicle suffered minor damage. She sought medical attention at Rapides Regional Hospital emergency room the same day with a complaint of back pain. Jones saw Dr. Gerald LeGlue (Dr. LeGlue) as her initial treating physician who later referred her to Dr. George Williams (Dr. Williams). Dr. Williams is a board certified orthopedic surgeon who has qualified as an expert witness in his field of medicine many times in various courts.

Jones experienced severe pain, a nine on a scale of one to ten, for many months. She was still experiencing pain at the time of trial two years post-accident. During the first four months post-accident Jones visited Dr. LeGlue thirteen times. She was treated for pain with medication, physical therapy and acupuncture. Jones missed four days of work due to her injury, but waives her loss wage claim. As a young single mother of two small children Jones works and attends nursing school. Dr. LeGlue eventually felt it necessary to order an MRI and refer Jones to Dr. Williams because Jones was not improving and was not getting relief from treatment. After studying the MRI and Jones' record from Dr. LeGlue, Dr. Williams recommended an epidural steroid spinal injection for which

he referred Jones to Dr. Melanie Firmin (Dr. Firmin).  According to Jones the steroid injection did not provide any relief but only resulted in aggravating her back pain.  Jones began experiencing radicular pain down her right leg and later in both legs.  Dr. Williams diagnosed radiculopathy which he opined was the result of her injuries in this accident.  He based this opinion on his clinical observations from a mechanical standpoint and on his theory that the cause of her radicular pain was chemical, despite there being no tear in the bulging disc visible on the MRI.  He explained that there must be a tear in the disc for leakage to be the cause of radicular pain and that even though the tear is not visible on an MRI it may still be present.  He knew of four diagnostic tests which could confirm his theory but explained the reason he thought these tests ill-advised for so young a patient as Jones.  He eventually recommended surgery as the only medical remedy for Jones' persistent pain.  After considering all factors concerning such a surgery Jones opted not to have surgery.

Defendants filed a pre-trial motion for a *Daubert*[1] hearing attempting to limit Dr. Williams' testimony so as to prohibit him from testifying as an expert on the subject of differential diagnosis of radiculopathy.  Following what the trial judge styled a *Daubert* hearing the trial court ruled all of Dr. Williams' testimony inadmissible.  Jones objected to the court's ruling, but the objection was overruled.  Jones proffered the deposition of Dr. Williams and it is contained in the record.  The trial court rendered judgment in favor of Jones and awarded her special damages in the amount of $5,822.16 and general damages of $5,000.00.  The trial judge based its award of special damages on its finding that Jones' attorney

---

[1] *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S.579, 113 S.Ct. 2786, 125 L.Ed2d 469 (1993). *State v. Foret*, 628 So.2d 1116 (La. 1993).

negotiated reduction of medical costs inures to Defendant's benefit as the collateral source rule is not applicable to such reductions. The trial court made no mention of assessing costs to either party and did not issue any oral or written reasons for its judgment.

Jones appeals the judgment asserting five assignments of error attacking the court's refusal to apply the collateral source rule to Jones' medical costs, exclusion of all of Dr. Williams' testimony, exclusion of Dr. LeGlue's testimony regarding chemical radiculopathy, the trial court's failure to assess costs against Defendants, and seeking an increase in damages. Jones sets forth her assignments of error as follows:

[Assignment of Error No.] 1: The trial court erred in granting defendant's Daubert motion and excluding, entirely, the testimony of Dr. George Ray Williams, a board certified and fellowship trained treating orthopedic spine surgeon practicing in Opelousas;

[Assignment of Error No]. 2: The trial court erred in excluding a portion of the testimony of plaintiff's principal treating physician, Dr. Gerald LeGlue of Alexandria;

[Assignment of Error No.] 3: The trial court erred in awarding the plaintiff only $5,000 in general damages in this case where the plaintiff suffered injuries for which she actively treated for thirty-one months and incurred medical bills of approximately $15,000;

[Assignment of Error No.] 4: The trial court erred in failing to cast costs against the defendant, including clerk's ledger costs, expert witness fees, and costs of medical records, and other taxable costs; and

[Assignment of Error No.] 5: The trial court erred in in this bench trial by applying an inappropriately stringent standard to medical testimony and opinion where she, rather than a jury, should have considered all testimony of the two treating physicians. In other words, the trial court overzealously performed a gatekeeping function in a bench trial, thus denying itself factual, diagnostic and causation testimony to support a reasonable award of damages.

## Legal Analysis

Following argument of counsel the trial court made its ruling in open court granting Defendants' motion to exclude testimony of Dr. Williams ordering that all of Dr. Williams' testimony be excluded. The court explained its ruling as follows:

> With the Daubert motion, we know that it's all the, the basis of this motion is all about methodology. And an expert can have an opinion, and we see experts have different opinions all the time. But, in order for an expert's opinion to be reliable, the basis of his opinion has to be reliable, and the foundation of his opinion has to be reliable.
>
> Without - - the Court is of the opinion that this evidence will be excluded, because there is no medical evidence that he relies on to form this opinion. And so therefore, the Court is of the opinion that the basis of his opinion is not reliable; so, therefore, his opinion would not be reliable.
>
> . . . .
>
> By Mr. Hunter: Now just for the record, Your Honor, are you excluding his entire deposition testimony.
>
> By The Court: Yes.
>
> There is a crucial difference between questioning the methodology employed by an expert witness and questioning the application of that methodology or the ultimate conclusions derived from that application. **Only a question of the validity of the methodology employed brings *Daubert* into play.** *MSOF Corp. v. Exxon Corp.,* 04–0988 (La.App. 1st Cir.12/22/05), 934 So.2d 708, 718, *writ denied,* 06–1669 (La.10/6/06), 938 So.2d 78. However, if a district court conducts no *Daubert* analysis of any kind, the exclusion of the expert's evidence without an evaluation of the relevant reliability factors is legal error. *Corkern,* 934 So.2d at 107.

*Carrier v. City of Amite*, 08-1092, pp. 4–5 (La.App. 1 Cir. 2/13/09), 6 So.3d 893, 897, *writ denied* 09-0919 (La. 6/5/09), 9 So.3d 874 (emphasis added).

We find the trial court failed to conduct a proper *Daubert* analysis. In fact, the methodology at issue here was not even called into question by the Defendants. Defendants agreed with Dr. Williams' position that there are four reliable diagnostic tests which he could have administered to Jones to verify his opinion as

4

to the cause of her radicular pain.  Defendants did not assert, and no evidence was put forth, that any of these diagnostic tests were unreliable or not generally accepted.   They argued instead, that because Dr. Williams admitted he did not conduct these tests he should not be allowed to give an expert opinion on chemical radiculopathy.   This allegation merely raised a question as to Dr. Williams' application, or rather his refusal to apply, accepted methodologies.  This goes only to the weight of his testimony regarding whether Jones suffered from radicular pain in her leg as a result of injury to her back sustained in this accident.  The "hearing," which consisted of no more than argument by counsel for each side, did nothing to inquire into the validity of any methodology used or any methodology the defense argues should have been used.  This was legal error.

Additionally, because Dr. Williams was Jones' treating orthopedic surgeon his testimony was relevant and useful in determining her past, present and future medical costs as well as her general damages for pain and suffering.   The Louisiana Code of Evidence, Article 401 defines relevant evidence as ". . . evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  "All relevant evidence is admissible, except as otherwise provided by the Constitution, of the United States, the Constitution of Louisiana, this Code of Evidence, or other legislation. . ."  La. Code Evid. Art. 402. It was legal error to exclude the entirety of Dr. Williams' testimony.  As Jones' treating physician his testimony is entitled to greater weight than any of Defendants' expert witnesses who either never examined her but only reviewed certain of her medical records or examined her for a limited purpose. *Murchison v.*

5

*Lyndon Property Ins. Co*., 04-933 p. 9 (La.App. 3 Cir. 12/30/04) 896 So. 2d 214, 221, *writ denied* 05-274 (La. 5/13/05), 902 So.2d 1016.

> As a general rule, the treating physician's testimony should be given more weight than that of a doctor who examines a claimant for diagnostic purposes only, and the testimony of a specialist is entitled to greater weight than that of the general practitioner when the subject at issue involves the particular field of the specialist. *Martin v. Emerson Elec. Co.,* 437 So.2d 910 (La.App. 2 Cir.1983); *Ellis v. Rapides Parish School Board,* 419 So.2d 990 (La.App. 3 Cir.1982).

*Clark v. State Farm Ins. Co.*, 520 So.2d 860, 864 (La.App. 3 Cir. 1987).

Because Dr. Williams' testimony by way of his deposition taken for trial purposes was proffered we have the benefit of this information to assist us in our de novo review of the case. It is therefore unnecessary to remand the case. When an error of law interdicts the fact finding process the court of appeal conducts a de novo review and when the record is complete, as here, renders judgment in the matter without the need for a remand to the trial court. *Cleco Evangeline, LLC v. Louisiana Tax Commission,* 01-2162 (La.4/3/02), 813 So.2d 351. In this case, because the trial court failed to assess court costs against the Defendants, the case must be remanded solely for the purpose of determining the costs to be assessed against Defendants. As a general rule, a party cast in judgment is taxed with costs of the proceedings. *Adams v. Canal Indem. Co*., 99-1190 p. 12 (La.App. 3 Cir. 5/10/00), 760 So.2d 1197, 1205 *writ denied*, 00-1636 (La. 9/22/00), 769 So.2d 1212. 00-1637 (La. 9/22/00), 769 So.2d 1213. In all other respects, this court will render judgment awarding damages to Jones appropriate in the cause.

Dr. Williams was tendered as an expert in orthopedic medicine. Our review of his curriculum vitae and his testimony regarding his qualifications as an expert in orthopedics and spine surgery leads us to conclude that he is clearly qualified in his field of expertise. He has been qualified numerous times in other courts as an

expert in his field and, given his credentials, we have no hesitation to accept him as an expert witness in orthopedic spine surgery and general orthopedics.

*Causation*

Jones bears the burden to prove there is a causal relationship between the injuries she sustained and the accident that she claims caused those injuries. "The test for determining the causal relationship is whether the plaintiff proved, through medical testimony, that it is more probable than not that the subsequent injuries were caused by the accident. *Bennett v. Louisiana Farm Bureau Cas. Ins. Co.,* 43,216 (La.App. 2 Cir. 4/30/08), 983 So.2d 966, 972." *Lohenis v. Rousse*, 14-1078 p.5 (La.App. 1 Cir. 3/9/15), 166 So.3d 1020, 1025 . In conducting our review of this case we must determine whether the injuries for which Jones seeks compensation were more probably than not caused by the collision for which Defendant's liability is admitted. Jones sought medical treatment shortly after the March 19, 2013 accident on the same day at Rapides Hospital Emergency Room. She was twenty-three years old at the time of the accident and had no history of prior back pain or pain radiating down her leg. She had no prior need of physical therapy treatments, pain medication, acupuncture or epidural steroid injections. She first treated with Dr. LeGlue on June 3, 2013. She continued treatment with her pain unresolved as of the date of trial.

Dr. LeGlue was accepted by the trial court without objection as an expert witness in physical medicine and rehabilitation. He is board certified in this field. When Dr. LeGlue first saw Jones she was having low back pain but no peripheral symptoms. She reported her pain increased with prolonged standing, lifting objects or certain types of movement. She explained to him that she was in a motor vehicle accident on March 19, 2013, but did not tell him about being in an

7

accident in 2011. He did not believe knowing about that accident would have changed his opinions about the injuries incurred in the 2013 accident. She had not been experiencing any pain or symptoms from the earlier accident. He physically examined her and observed tenderness to touch from T12 through L1 areas of the spine as well as the last three thoracic to first lumbar area. He also observed tenderness in the posterior superior iliac spine where the pelvis and backbone are attached. Her lateral flexion side-to-side was three fourths normal, with pain upon movement, and her right rotation was about half of normal. Left rotation was three fourths normal. She experienced pain during right rotation but not on the left. She complained of pain when he stretched the piriformis muscle which attaches the hip to the sacrum. Dr. LeGlue explained when a person is in an auto accident they typically have their right foot forward and upon impact the pelvis rotates in a manner humans are not designed for resulting in injury such as the sprain in her back. Dr. LeGlue concluded Jones suffered injuries to her spine in the accident that did not heal appropriately. These physical observations and hands-on examination lead him to a diagnosis of a "thoracic and lumbar facet sprain, right piriformis strain, i.e. piriformis syndrome implying chronicity in the iliolumbar sprain, i.e., dysfunction, again, implying a certain chronicity" as a result of the accident. He prescribed physical therapy three times a week for two weeks. He also prescribed an anti-inflammatory medication, Meloxicam and two narcotic alagesics, Hydrocodone and Lortab. The evidence shows Jones filled these prescriptions on June 3, 2013 and continued to refill these and other medications through January 2015. (At a certain point Lortab was taken off the market and replaced with the drug Norco.)

8

Dr. LeGlue saw Jones again on July 24, 2013. He observed that she had been unable to attend all of the physical therapy sessions due largely to her time constraints with her job, nursing school and two small children. The physical therapist had given her instructions on exercises to do at home and she maintains she complied with those instructions. Dr. LeGlue examined her again and found she had made improvement and was feeling better. "[H]er buttock was stable. The piriformis looked like it had stretched out okay. Her low back pain was intermittent at this point. It wasn't constant." Because Jones still had what he termed "long-running pain," Dr. LeGlue recommended acupuncture as a possible remedy. He is formally trained and board certified in acupuncture. Jones did not feel any relief and did not want to try acupuncture again. He continued her on Meloxicam and Lortab for pain.

He next saw her on August 20, 2013. She reported increased pain following the acupuncture treatment on the previous visit which caused her to refuse trying it again. Jones was still experiencing low back pain which had increased in intensity. Dr. LeGLue felt it necessary at that point to order an MRI because he observed she was experiencing symptoms "way beyond soft tissue ending times." He was convinced something else was causing this continued pain. The MRI confirmed his suspicions and indicated a "broad disc protrusion" which shows why this accident aggravated her pre-existing condition of hypertrophy in her facet joint (most likely due to her having been pregnant twice before the accident.) He opined that the trauma of this accident "opened up a can of worms." Jones was asymptomatic before the accident but post-accident was experiencing serious low back pain and later radicular pain in her leg. Dr. LeGlue found this finding to be consistent with this type of accident and consistent with his clinical observations

9

and hands-on examinations of Jones. He saw Jones again on August 29, 2013, and discussed the MRI results. He opined the protruding disc was caused by the accident and was the reason for Jones' continued back pain and radicular pain. He testified that he did not perform any diagnostic tests to further confirm the source of Jones' radicular pain but did explain that a patient can indeed be experiencing such pain even when the MRI does not show a visible tear. This, he explained, is because the MRI is performed with the patient in a static state, but when the patient moves the problem occurs due to rotation of the facet joints but the MRI is not scanning the person in motion. Dr. LeGlue testified physical therapy cannot do anything for Jones' protruding disc, thus it was of no moment that she was unable to attend all of the earlier prescribed therapy sessions. At this point he felt it necessary to refer Jones to an orthopedic surgeon, Dr. Williams. He saw Jones again of October 29, 2013, and noted Dr. Williams had put her on a twenty pound lift restriction which indicated to him that Dr. Williams also believed the disc was at issue. He also noted Dr. Williams added the medication Flexeril, a muscle relaxer, and Norco for pain. He agreed with Dr. Williams' recommendation that Jones try an epidural steroid injection. Dr. LeGLue entered the following notation in Jones' chart:

> Patient, since last seen, is continuing under the care of Dr. Williams. Continues with low back pain, paro-intermittent bilateral lower extremity pain and paresthesis. No recurrent trauma. Has had questioned SMO this past summer in Lafayette. Reports surgeon felt patient too young to undergo surgery but suggests repeat MRI. Continues to work at Longleaf as Mental Health Tech and attending LSU-A. She's on Norco 10 milligrams TIB, three times a day, as needed.

> And I also note, in asterisk, she's had no blood work for the past couple of years. And I would suggest she get some blood work to check her liver functions on the medicine she's on.

10

Dr. LeGlue last saw Jones the day before trial and observed in his notes she was still experiencing low back pain.  He concluded his testimony by saying:

> Q.  So we've got more than two years of pain and suffering. Given what you've seen, do you think that was caused by the accident?
>
> A. Yes, sir.
>
> Q.  Do you think that it may persist?
>
> A.  You have to assume, statistically, that is, up to this point in time, statistics suggest you're going to have a poor outcome, given two-and-a-half years of chronic pain, sir.
>
> Q.  She may have it forever?
>
> A.  That's possible.

*Dr. Williams Testimony*

Dr. Williams first saw Jones on September 17, 2013, as a referral from Dr. LeGlue.  Jones told him about the motor vehicle accident and informed him that she had no prior history of back pain.  She was experiencing back pain at that visit but was not having any radicular pain at that time.  Dr. Williams' physical exam of Jones revealed she had "limited range of motion of the lower back, and she had pain to palpation over the lumbar area, spinous process region."  Based on his review of her x-ray and physical examination he diagnosed "lumbar spondylosis and lumbar sprain."  He opined these injuries were the result of the auto accident at issue.  He prescribed physical therapy and imposed a twenty-pound lift restriction. He next saw her on November 12, 2013.  Jones was still experiencing pain in the upper and lower lumbar region as indicated by his physical examination.  She continued to experience "limitations in flexion and rotation.  And now she was having a little bit of numbness in the lower nerve root distributions on her back." Dr. Williams reviewed Jones' MRI and the radiologist's report on the MRI, which

11

showed "she had a disc protrusion at the L4-5 region. So we had low back pain, a herniated disc, and radiculopathy." Defendants objected to Dr. Williams' reference to the radiologist's findings. "An expert may provide testimony based on information obtained from others and the character of the evidence upon which the expert bases an opinion affects only the weight to be afforded the expert's conclusion. *State v. Pooler,* 96-1794 (La.App. 1st Cir.5/9/97), 696 So.2d 22, 55, *writ denied,* 97-1470 (La.11/14/97), 703 So.2d 1288." *MSOF Corp. v. Exxon Corp.*, 04-988 p. 16 (La.App. 1 Cir. 12/22/05), 934 So.2d 708, 720, *writ denied*, 06-1669 (La. 10/6/06), 938 So.2d 78. Dr. Williams described the disc protrusion as "notable" and opined that this explained Jones' pain and her other symptoms. When asked his thoughts on Dr. Curtis Partington's (Dr. Partington) opinion that the MRI looked "normal" Dr. Williams replied: "We felt [it was] somewhat surprising because you can clearly see she has an abnormality at 4-5. So I asked our radiologist to take a look at it to make sure (sic) I wasn't missing something, and they clearly agreed that there's an abnormality at L4-5."

Jones next saw Dr. Williams on February 11, 2014. She reported that the physical therapy had not helped and she was still in pain. Dr. Williams recommended she try an epidural steroid injection for which he referred her to Dr. Melanie Firmin. This treatment was not helpful and now Jones was experiencing more back pain and pain down her right leg. His physical examination of Jones on this visit confirmed what Jones was describing and he observed she still was having "limitation in flexion and rotation." His opinion remained unchanged— "herniated nucleus pulposus and lumbar radiculopathy" which he again opined was caused by the accident at issue. He did not see her again until November 11, 2014, at which time she was still having back pain and right leg pain. When he next saw

Jones on February 10, 2015, she was again experiencing back pain but now was having pain down both legs. Dr. Williams explained that Jones' radicular pain in both legs was likely both mechanical and chemical radiculopathy. He opined it was partly mechanical due to the disc protrusion at L4-5 which he described as a classic cause of the kind of pain Jones was having.

Dr. Williams explained that he thought it ill advised to subject Jones to a discogram just for the sake of making a more definite diagnosis of the cause of her radicular pain. He described a discogram as "a provocative test" which is known to "cause either accelerated or a premature degeneration of the disc." He opined that administering this test to Jones would "more probably than not" cause accelerated degeneration of several discs. In short, he believed, based on his expertise, that "the risks associated with [administering a discogram] would be outweighed by academically proving what [he believed was] happening [was] actually happening[.]"

Dr. Williams last saw Jones on May 26, 2015, before trial. Jones told him at that time she was still having pain. She explained that she tried to engage in her normal activities but pays for the effort afterwards. He opined this was consistent with the type of injury she had as evidenced by the protruding disc. Lastly, Dr. Williams concluded his opinion of Jones' condition stating:

> We were hopeful that, you know, the non-surgery stuff did. That's why we stressed, you know, the therapy, the medicine, the shots, but she's been persistently actually getting worse since over a two and a half year period. So that's the only last thing we have to offer is surgical intervention.
>
> . . . .
>
> The type of disc she has has a good chance for recurrent disc herniation, so that's why we're opting for the fusion as opposed to a simple decompression.

13

Dr. Williams estimated the cost of this surgical procedure to be $20,000.00 for his fee and $5,000.00 for the PA fee. The recommended surgery is described by Dr. Williams as a transforaminal inner body fusion or TLIF.

*Defense Experts*

*Dr. Neil C. Romero*

Dr. Romero was accepted as an expert in the field of orthopedic surgery without objection. He is board certified in orthopedic surgery. Interestingly, both he and Dr. Williams attended the same fellowship training for spine orthopedics at Stanford University and St. Mary's Hospital in San Francisco. He opined, based on his single examination of Jones, that her leg pain was due to bursitis. He STATED that this could have been caused by Jones walking with an uneven gait as a result of back pain. As the expert witness for Defendants, it is noteworthy that he dispelled any notion that Jones suffered from injuries related to previous minor accidents. When asked about previous auto accidents Jones was involved in he responded that she did not tell him about those accident because, he felt, she did not think they were "terribly significant." Apparently neither did he, as he explains in his response to questions about Jones' prior accidents:

> Q. Do you find this in any way, based on the records, to be significant, any of those prior accidents?
>
> A. No. Because, to be honest with you, it was mostly neck pain symptoms. She did undergo some chiropractic treatment for her neck pain in 2011. The chiropractic notes did not note that she had improved. She was involved in another accident in 2011. She really didn't undergo much treatment for it at that point, she just says it resolved, and she was diagnosed with a lumbar strain, and then she was involved in another accident in later 2011, and her only complaints at that visit were humerus and wrist pain, so there were no back pain symptoms there. So, I'll be honest with you, after reviewing the records, I didn't think she had a significant previous lumbar spine history.

14

Dr. Romero was unable to offer any opinion as to why Jones experienced right leg pain following the epidural steroid injection. He agreed that it was certainly possible for Jones to experience such pain after this procedure and opined "it was consistent with Dr. Williams' notes and what she told me during the exam." He did not agree that surgery was indicated at this point in Jones' treatment and opined that he would want to have another MRI done before "jumping" to surgery. He testified that he could not determine the cause of Jones' back and leg pain but said "I think her problem is mainly consistent with some back pain symptoms that are consistent with a lumbar strain as well as a trochanteric bursitis." He did, however, associate her pain and his diagnosis of her injuries as being caused by the accident at issue. He would recommend "physical therapy, home exercises, core strengthening, anti-inflammatories, some activity modification, but generally, you know, six to eight weeks is usually a good course of treatment for this and then start to increase their activities from there." We note that much of Dr. Romero's recommendations, based on his *one* visit with Jones, is in agreement with her treating physicians opinions and treatments. Jones' history with her treating physicians shows that she did not improve in six to eight weeks which fact caused her treating physicians to conclude that her injuries were more serious than a sprain, and to conclude that they were correct in their readings of her MRI showing a protruding disc at L4-5 as the cause of her continued problems. Also telling is Dr. Romero's opinion that two years is a long time to be on narcotic pain medications like those Jones has been taking. He agreed with prescribing the medications prescribed by Jones' treating physicians but opined that he would, at that point, send his patient to pain management. On cross examination Dr. Romero described the course of treatment he would prescribe for Jones' lumbar

15

strain and opined that if she followed his recommendations to have epidural steroid injections, physical therapy, and core strengthening exercises, he would "hope" her symptoms would get progressively better after about three months. When asked if he thought Jones would be at least occasionally bothered by back pain, after completing his recommended course of treatment he responded "I don't think that would be unusual." He opined that she might continue to be bothered for up to six months after the three months of his recommended treatments including injections. He also opined that he did not believe Jones was malingering.

*Dr. Curtis Partington*

Dr. Partington was accepted as an expert in the field of neuroradiology over the objection of Jones. He is board certified in general diagnostic radiology and in neuroradiology. Jones initially objected to accepting Dr. Partington as an expert witness in this case because he never actually saw Jones but merely reviewed only the MRI and x-ray taken after this accident supplied to him by defense counsel. Jones does not challenge the court's acceptance of Dr. Partington as an expert witness on appeal.

Dr. Partington reviews MRIs and other medical records under his business known as Independent Medical Reviews, LLC. He and an office manager are the only members of the LLC. He testified that approximately 80% of his referrals to review records are from defendant insurance companies. He also testified that he reviews as many as 50 MRIs and x-rays a day but he "generally quit[s] when [he] get[s] just over 40 or 45." In his words by that point "you start getting a little faded . . . tired and fatigued and I shouldn't be doing this anymore . . ." He could not say how many reviews he had performed during the day before looking at Jones' MRI and x-ray. He also testified he did not look at any other of Jones'

medical records nor was he interested in reading the reports and findings of Jones' radiologists or treating orthopedic surgeon. He opined that the MRI and x-ray showed a normal lumbar spine, meaning to him that if her disc appeared to be bulging "less than one millimeter or two" he would consider it a normal spine for a woman Jones' age. He states in his report dated June 22, 2015, that L5 is "mostly sacralized" but opines that this different shape, which is abnormal, is found in 5% of the population, and would not be the cause of any back pain. He says he sees no evidence of any injury to the spine or soft tissues. He does admit that there are causes of back pain that cannot be seen on an MRI, such as muscle strains or ligament strains. He is of course unable to comment on whether Jones might be suffering from these causes because his knowledge of her condition is limited to only her MRI and x-ray. When pressed on cross-examination about his testimony regarding leakage of disc material as a cause of radiculopathy, Dr. Partington pulled back on his insistence that there must be a tear and it can always be seen on the MRI if it's there. Instead, he admits under cross-examination that he cannot rule out the possibility that Jones could have leakage of material from a disc that would not be detectable on the MRI or x-ray he viewed but could be significant enough to cause chemical radiculopathy. He also acknowledged he cannot see pain on an MRI.

We find Dr. Partington's opinion does little to contradict the findings of three medical experts, two of which are Jones' treating physicians who have examined her and reviewed her MRI and x-rays with the benefit of hands-on physical examinations to reach their conclusions. Even Dr. Romero, as Defendants' expert, is at odds with Dr. Partington's notions. Perhaps Dr. Partington was, as he described, "getting a little faded" when he reviewed Jones'

17

MRI and x-ray. Dr. Partington's testimony, based on limited knowledge of Jones, is entitled to far less weight than her treating physicians, the importance of such rule is underscored by his testimony.

Based upon our review of the record we find Jones has proved causation by a preponderance of the evidence, and she is, therefore, entitled to compensation for her injuries and the pain and suffering she has endured and continues to experience.

*Special Damages*

*The Collateral Source Rule*

Plaintiff asserts she was entitled to all of her medical costs totaling $15, 163.43. Defendants contend this sum includes amounts which were not actually paid as a result of attorney-negotiated discounts. The Louisiana State Supreme Court, in *Hoffman v. 21st Century North American Ins. Co.*, 14-2279 p. 5 (La. 12/7/15), ___ So.3d ___, "[adopted] a bright-line rule that such attorney-negotiated discounts do not fall within the ambit of the collateral source rule. . ." Thus, any sums which were not actually paid by Jones due to an attorney-negotiated reduction are not recoverable. We hasten to add, however, that such sums have a bearing in the determination of general damages. Additionally, under the collateral source rule, Defendants do not enjoy the benefits of reductions in Jones' medical costs which were the result of Jones' medical insurance cost adjustments (such as the $1,925.33 covered by Jones' medical insurance for pain medications at Walgreens) or her discount due to self-pay at Central Louisiana Surgical Hospital, as these reductions adversely affect Jones' patrimony.

*Medical Expenses*

In *Watson v Hicks,* 15-46, 15-47-15-48 p. 26 (La.App. 4 Cir. 5/27/15), 172 So.3d 655, 675 our sister circuit succinctly set forth the governing principles regarding awards for special damages as follows:

> • When a plaintiff alleges that he or she has incurred medical expenses as a result of injuries suffered in an accident and that medical treatment is evidenced by a bill, the bill is sufficient to support an award for past medical expenses "unless there is sufficient contradictory evidence or reasonable suspicion that the bill is unrelated to the accident." *Earls v. McDowell,* 07–17, pp. 7–8 (La.App. 5 Cir. 5/15/07), 960 So.2d 242, 248 (citing *Stiltner v. National Union Fire Ins. Co.,* 00–2230 (La.App. 4 Cir. 10/3/01), 798 So.2d 1132).
>
> • A tortfeasor is required to pay the expenses of over treatment or unnecessary medical treatment, "unless such treatment was incurred by the victim in bad faith." *Montgomery v. Kedgy,* 44,601, p. 9 (La.App. 2 Cir. 8/26/09), 21 So.3d 980, 986–87 (citing *Green v. Nunley,* 42,343–44 (La.App.2d Cir.8/15/07), 963 So.2d 486; and *Sumrall v. Sumrall,* 612 So.2d 1010 (La.App. 2d Cir.1993)).
>
> • Absent bad faith, "it is error for the trier of fact to fail to award the full amount of medical expenses that are proven by a preponderance of the evidence that were incurred as a result of an accident." *Earls,* 07–17, p. 8, 960 So.2d at 248 (citing *Simon v. Lacoste,* 05–550 (La.App. 3 Cir. 12/30/05), 918 So.2d 1102); *Boxie v. Smith–Ruffin,* 07–264, p. 13 (La.App. 5 Cir. 2/6/08), 979 So.2d 539, 548.

The evidence submitted supports the following medical expenses were incurred by Jones as a result of injuries she sustained in this motor vehicle accident. There is no convincing contradictory evidence and no reason presented to suspect that these bills are not related to Jones' injuries sustained in this accident. For clarity we set forth Jones medical bills as follows:

Central Louisiana Surgical Hospital: $6,764,15

Dr. George Williams: $1,535.00

Dr. Gerald LeGlue: $2,133.00

Dr. Melanie Firmin: $1,560.00

Emergency Group Rapides: $528.00

MR Imaging: $825.00

Rapides Regional Medical Center: $684.00

Walgreens: $2178.49

Total: $16,207.64

We thus award Jones the sum of $16,207.64 as special damages for her medical costs incurred as a result of injuries sustained in this accident.

*General Damages*

In *Bellard v. American Central Ins. Co*., 07-1335, p. 29 (La. 4/18/08), 980 So.2d 654, 674, (citation omitted) the state supreme court reiterated the standards set forth in *Duncan v. Kansas City Southern Railway Co*., 00-66 (La. 10/30/00), 773 So.2d 670 regarding a determination of general damages:

> "General damages are those which may not be fixed with pecuniary exactitude; instead, they 'involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.'"

In *Watson* the fourth circuit elaborated on the considerations for an award of general damages:

> General damages may be established in three ways: (i) the circumstances of the case, (ii) expert medical testimony, and (iii) the tort victim's testimony. Frank L. Maraist & Thomas C. Galligan, Jr., LOUISIANA TORT LAW § 7.02[3] (2004 ed.). "General damages do not have a common denominator and are determined on a case by case basis." *Glasper v. Henry,* 589 So.2d 1173, 1180 (La.App. 4th Cir.1991) (citing *Bernard v. Royal Insurance Co.,* 586 So.2d 607 (La.App. 4th Cir.1991)). The jurisprudence holds that the duration of a plaintiff's symptoms and treatment are relevant factors that courts must consider in assessing general damages. *See Gillmer v. Parish Sterling Stuckey,* 09–0901 (La.App. 1 Cir. 12/23/09), 30 So.3d 782, 788; *Glasper, supra* (noting the factors to be considered in assessing quantum for pain and suffering are severity and duration).

*Watson,* 172 So.3d at 677–78.

Additionally, it is well-settled in our jurisprudence that:

> [A] defendant in a personal injury case takes the victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. When the tortfeasor's conduct aggravates a pre-existing condition, the tortfeasor must compensate the victim to the full extent of the aggravation. *Robinson v. Tolbert,* 40,488 (La.App. 2 Cir. 1/20/06), 920 So.2d 346, 348.

*Lohenis v. Rousse*, 14-1078 p. 4 (La.App. 1 Cir. 3/9/15, 4), 166 So.3d 1020, 1024-25.

Jones' reference to cases decided in this circuit regarding the quantum of damages for injuries such as those suffered by Jones in this case are persuasive.[2] Jones has endured pain and suffering for two years prior to trial and her pain as well as treatment for her pain is expected to continue after her case has been decided. Our de novo review of the evidence leads us to conclude that Jones, at the very least, has suffered for twenty-four months with low back pain and pain radiating down both legs. There is evidence that Jones will continue to suffer, at least intermittently, and that the only full remedy for her pain will be a surgical procedure. Jones has stated she does not intend to have such surgery and she does not seek recovery for the projected $25,000 cost of such surgery. We find the evidence on this issue is insufficient upon which to base an award for these speculative future medical costs. No other evidence of future medical costs appear in the record and we will not speculate as to such costs. However, what is in the record is that Jones' medical costs as a result of injuries sustained in this accident total $16,933.76, with a small portion of that amount not being recoverable as special damages due to the reduced amount resulting from her attorney's efforts.

---

[2] *Stelly v. Zurich American Ins. Co.,* 11-1144 (La.App. 3 Cir. 2/1/12), 83 So.3d 1225; *Williams v. Finley, Inc.*, 04-1617 (La.App. 3 Cir. 4/6/05), 900 So.2d 1040; *Robinson v. Fontenot*, 02-704 (La. 2/7/03), 837 So.2d 1280; and *Alex v. Rayne Concrete Service*, 04-1555 (La.App. 3 Cir. 9/14/05), 915 So.2d 931.

With the above principles in mind applied to the evidence of record we find Jones entitled to an award of $30,000.00 as general damages. We base this award considering other awards for similar circumstances such as those reflected in the cases cited above and in *Watson*:

> *Sanchez v. Dubuc,* 12–526, p. 10 (La.App. 5 Cir. 2/21/13), 110 So.3d 1140, 1146 (noting that "[e]ven without disc involvement, there is support in the jurisprudence for an award of $2,000 to $2,500 per month for soft tissue injuries" and collecting cases illustrating such awards); *Edwards v. GEICO Indem. Co.,* 14–606 (La.App. 3 Cir. 3/18/15), 167 So.3d 957, (holding that "awards in the $30,000 range are reserved for treatment of longer duration and injuries that significantly affect quality of life"). As to Mr. Watson, we find the highest reasonable award for the injuries at issue is $15,000.00. *See Lohenis v. Rousse,* 14–1078 (La.App. 1 Cir. 3/9/15), 166 So.3d 1020, (awarding $15,000.00 in general damages for the aggravation of pre-existing injuries despite that "it was not clear to the district court [and] ... not clear from the record and exhibits before [the appellate] court when the plaintiff's chronic neck and back pain returned to its 'pre-accident state.' ")

*Watson*, 172 So.3d at 679.

For the reasons set forth we render judgment in favor of Jones and award her the sum of $16,207.64 as special damages and the sum of $30,000.00 as general damages. We remand the case to the district court for the sole purpose of determining the amount of costs in the trial court all of which costs are to be assessed against Defendants. All costs of this appeal are assessed Defendants.

**Reversed. Judgment Rendered. Remanded in part with instructions**.

22