STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

21-790

KAYLA LANDRY

VERSUS

STATE FARM AUTOMOBILE INSURANCE COMPANY, ET AL.

**********

APPEAL FROM THE
THIRTY-FIRST JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON DAVIS, NO. C-327-18
HONORABLE JULES D. EDWARDS, III, DISTRICT JUDGE PRO TEMPORE

**********

JOHN E. CONERY
JUDGE

**********

Court composed of John E. Conery, Van H. Kyzar, and Sharon Darville Wilson, Judges.

AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.

**Todd M. Ammons**
**Darrell G. Guidry, Jr.**
**Stockwell, Sievert, Vicellio, Clements, & Shaddock, LLP**
**Post Office Box 2900**
**Lake Charles, Louisiana  70602**
**(337) 436-9491**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **State Farm Mutual Automobile Insurance Company, in its capacity as**
    **UM Insurer for Kayla Henry**


**Justin T. Morales**
**Jordyn A. Goody**
**The Townsley Law Firm, LLP**
**3102 Enterprise Boulevard**
**Lake Charles, Louisiana  70601**
**(337) 478-1400**
**COUNSEL FOR PLAINTIFF/APPELLANT:**
    **Kayla Landry**


**Kyle M. Beasley**
**Christopher J. Rinn**
**Plauché, Smith & Nieset, LLC**
**Post Office Drawer 1705**
**Lake Charles, Louisiana  70602**
**(337) 436-0522**
**COUNSEL FOR DEFENDANT/APPELLEE:**
    **State Farm Automobile Insurance Company**
    **Brad David Racca**
    **Grant Alan Racca**
    **Kendal Henry**

**CONERY, Judge.**

By this appeal, Plaintiff Kayla Landry questions apportionment of fault and causation of injury related to a May 25, 2017 automobile collision occurring in Jennings, Louisiana at the intersection of Highway 26 and Interstate Drive. Following a bench trial, the trial court determined Plaintiff to be 25% at fault due to her failure to exercise caution in proceeding into the intersection under the yellow light facing her. The trial court assessed the remaining 75% of fault to Defendant Grant Racca (Grant), due to his failure to yield the right-of-way to Plaintiff as he executed a left turn, colliding into her vehicle. Despite its apportionment of fault, the trial court determined that Plaintiff failed to prove that the collision caused Plaintiff's injury, a torn right rotator cuff. Plaintiff appeals. For the following reasons, we affirm in part, reverse in part, and render.

## FACTS AND PROCEDURAL HISTORY

At the time of the accident at issue, Plaintiff was driving her Chevy Malibu on Highway 26 in Jennings, Louisiana. The Uniform Motor Vehicle Traffic Crash Report, prepared by Officer Brooke Rice[1] of the Jennings Police Department, indicates that Plaintiff "advised that she went under the YELLOW LIGHT; and that is when the other vehicle collided with her driver[']s side." In her contemporaneous, handwritten report affixed to the Crash Report, Plaintiff explained: "I Kayla Landry was driving on Hwy 26 going under the light and a white truck hit my driver[']s side[.] [H]e was coming north on 26."

Approximately five days after the accident, Plaintiff amended her statement after a friend urged her to provide more detail. Plaintiff explained therein:

---

[1] At the time of trial, Officer Rice used the surname of Duhon. We refer to her as Officer Rice, the name reflected on the Crash Report.

I Kayla Landry was driving on HWY 26 traveling south in the right lane. I was going under the light when it turned yellow. As I was going through the light I looked over to my left and saw this white truck making a U turn (which is illegal)[.] I swerved to the right to try to avoid him hitting me. He came across and hit me on the driver['']s front side of my car.

The "white truck" referenced by Plaintiff was a Ford F-350 driven by Grant and owned by his step-father, Brandon Henry (Mr. Henry). Officer Rice explained in the Crash Report that Grant, sixteen years old at the time of the accident, "stated he was driving North on Highway 26 when he attempted to make a left hand turn. Mr. Racca advised that the light was GREEN when he began to turn left." Grant acknowledged at trial that although the light facing him was green, he did not have a green turn arrow. Grant explained that he followed behind a left turning truck and trailer into the intersection and that he felt he could safely do so as the southbound cars in the lanes adjacent to that of Plaintiff had stopped.

Plaintiff stated that upon entering the intersection and seeing Grant's approaching truck, she attempted to swerve to the right. She was unable to avoid the crash, however. After she was struck by Grant's truck, Plaintiff's vehicle "shook" and she heard a "loud noise." The Crash Report indicates that Plaintiff's vehicle sustained damage to its front driver's side and had to be towed from the scene, whereas Grant's truck sustained only "minor damage on the front push bumper."

Plaintiff did not report immediate injury to Officer Rice at the time of the crash, as reflected in the Crash Report. Neither did Plaintiff report injury five days later when interviewed by the adjuster for State Farm Mutual Automobile Insurance Company (State Farm), the UM provider for Plaintiff as well as the liability insurer of the truck driven by Grant and owned by his step-father, Mr. Henry. When asked whether she was "injured at all[,]" Plaintiff responded, "No ma'am." Plaintiff later

explained however, that she felt "shook up" and "sore" from the accident and did not immediately appreciate that the pain she felt following the accident was an "injury" per the inquiry of either Officer Rice, at the scene, or the State Farm adjuster. Plaintiff testified that on returning home after the accident she took Tylenol and "did heat and cold" on her shoulder. Plaintiff's friend, Mistie Landry (Mistie), explained that she provided Plaintiff with a ride from the accident scene and that Plaintiff appeared "kind of shooken up[.]" Mistie reported that Plaintiff indicated her arm was "hurting" and "bothering" her that night.

Plaintiff reported to her job at Butchie's Corner, a convenience store, the day following the accident. Plaintiff testified, however, that she needed assistance in performing her work tasks, which included working the cash register, stocking the coolers, and performing food service-related tasks. Kimberly Lessigne, Plaintiff's long-time friend and co-worker at Butchie's Corner, confirmed that she learned of Plaintiff's accident the next time she worked with Plaintiff at the store. Plaintiff reported pain and difficulty lifting during the course of their work together. Ms. Lessigne testified that given Plaintiff's difficulty in lifting her right arm, Plaintiff would either perform tasks with her left hand or "switch jobs" to something that she could perform more easily.

Plaintiff continued working and, according to her testimony, continued to experience increasing pain upon activity, particularly lifting. In July 2017, two-months post-accident, Plaintiff's pain symptoms continued and she sought treatment from Dr. Joel Conner, a chiropractor. Plaintiff attributed her pain to the accident and reported that her shoulder hurt when she would "pick up something heavy[.]" She explained that she experienced pain daily, that her pain level was a 5 on a scale of

3

10 at the time of the visit, and that it had been a 10 out of 10 on the night of the accident.

According to Dr. Connor, he saw Plaintiff for less than ten minutes and told her that he was unable to help given what he felt was a more serious condition than he could "take care of." He recommended that she see an orthopedist. Dr. Connor stated in his deposition that he did not perform range of motion tests with Plaintiff because she was holding her arm and crying. Given that history, Dr. Connor attributed Plaintiff's injury to the car accident.

Five months post-accident, on October 26, 2017, Plaintiff visited Dr. Paul Fenn, an orthopedist with whom she had treated for prior injuries. Plaintiff reported that she experienced right shoulder pain and weakness on lifting since the accident. A January 2018 arthrogram revealed a "massive" tear of the right rotator cuff. Dr. Fenn explained in his deposition that although the tear was large, he would attempt surgical repair of the shoulder. Further, in his deposition, Dr. Fenn confirmed on questioning by counsel for State Farm that "[h]olding onto a steering wheel driving down the highway," was not a "mechanism of injury[,]" but that the accident was a "reasonable mechanism" of injury. Dr. Fenn explained more fully that:

> Holding onto a steering wheel driving down the highway, no. But if there's a motor vehicle collision, I have given up trying to opine on what happens to a body in the middle of a collision. So assuming there's a hard enough collision to do some damage to the vehicle, sure, that's a reasonable mechanism.

Dr. Michael Duval, an orthopedic surgeon, examined Plaintiff and rendered a second medical opinion on behalf of State Farm on July 2, 2019. Dr. Duval opined in his deposition that the size of the tear indicated that it was caused by a "significant, traumatic event" and, in his second medical opinion report, that it was "difficult to conceptualize a mechanism of injury to cause this simply holding onto a steering

4

wheel." Dr. Duval noted that Plaintiff explained to him that she had previously injured her left shoulder in a fall but denied having harmed her right shoulder at that time.

Dr. Duval explained that such a tear would have caused an "onset of severe pain and the inability to use one's arm or lift it at all." Dr. Duval testified in his deposition that although he did not dispute Plaintiff's history, he thought it was more likely than not that the subject accident did not cause the tear shown on the MRI. Dr. Duval found the injury to be so profound that he felt that the shoulder could not be reconstructed and that given her young age,[2] replacement would not be recommended.

In his own deposition, Dr. Fenn generally agreed with Dr. Duval regarding the severe pain and inability to use the arm normally associated with a massive tear to the rotator cuff. He further confirmed that normally it was unlikely that someone with the identified injury would have reported no injury at all five days after such an impact. However, Dr. Fenn substantially changed that statement during his trial testimony when he discovered for the first time that Plaintiff's diabetic condition had reached an advanced state, as reflected below in the discussion regarding causation of injury.

Seeking both damages and medical care, particularly with regard to surgical repair of her right shoulder, Plaintiff filed suit on May 22, 2018, naming Grant's parents, Brad Racca and Kendall Henry as defendants. Plaintiff also named State Farm Mutual Automobile Insurance Company as a defendant, both in its capacity as the liability insurer of Kendal Henry, Brad Racca and/or Grant Racca and in its

---

[2] Plaintiff was 33 years of age at the time of the May 25, 2017 accident.

5

capacity as Plaintiff's own UM insurer. Plaintiff later amended the petition after Grant attained majority and named him as a defendant in his own right.

Defendants questioned Plaintiff's own fault in the accident given the uncertainty pertaining to the stage of the yellow light when Plaintiff proceeded through the intersection. Defendants further denied that Plaintiff's torn right rotator cuff was caused by the accident, noting both her delay in seeking treatment and her attribution of causation to having her arm on the steering wheel at the time of the crash.

In August 2021, the parties entered into a joint stipulation for the "Gasquet-style" release[3] of Grant and his parents, with Plaintiff preserving the right to pursue recovery from State Farm for the remaining bodily injury limits that the State Farm policy provided coverage for the Racca/Henry defendants, up to $25,000.00, and for the UM limits of Plaintiff's UM policy, $15,000.00.[4]

---

[3] In *Gasquet v. Commercial Union Insurance Company*, 391 So.2d 466 (La.App. 4 Cir. 1980), *writs denied*, 396 So.2d 921, 922 (La.1981), the fourth circuit recognized that a plaintiff may release a defendant but reserve his or her rights against an insurance company.

[4] The parties entered into a Joint Stipulation providing as follows regarding the amount in controversy:

> 2.    Plaintiff and Defendants stipulate that pursuant to a "Gasquet-style" release executed by Plaintiff Kayla Landry on June 13, 2019, Plaintiff has no right to recover any damages against the individuals Kendal Henry, Brad David Racca, and Grant Racca, as a result of, or in any way arising from, the motor vehicle accident made the basis of this litigation which occurred on May 25, 2017. However, Plaintiff does have the ability to recover up to the bodily injury limits of $25,000, from State Farm as the remaining liability insurer of Kendal Henry, Brad Racca and Grant Racca, which limits are provided by the State Farm Policy number 181-5520-B11-18E, and up to $15,000 from State Farm as the uninsured/underinsured motorist carrier for Plaintiff provided by State Farm Policy number 293728918.

> 3.    Plaintiff and Defendants stipulate that pursuant to a written stipulation executed by Plaintiff Kayla Landry on April 11, 2019, and the Plaintiff's Motion and Order for Bench Trial filed on January 5, 2021, that the total amount in controversy in this litigation does not exceed $50,000, exclusive of interest and costs.

The matter proceeded to an October 14, 2021 bench trial. At the beginning of trial, the trial court recognized the parties' Joint Stipulation which, in addition to reflecting the limitation on the amount in controversy, acknowledged State Farm's lack of objection to the "admissibility and introduction" into evidence of the reports of Dr. Aaron Wolfson, an expert in vocational rehabilitation and life care planning, and of Dr. Charles Bettinger, an expert economist.

Dr. Wolfson's report reflects the surgery recommended by Dr. Fenn as well as associated follow-up care associated with Plaintiff's projected recovery costs. Dr. Bettinger's report of "Economic losses from future losses from medical care for Ms. Kayla Landry" reflects a "present value" of the costs estimated by Dr. Wolfson in the total amount of $510,250.00. As for other damages, Plaintiff presented a Medical Bill Index reflecting that she had incurred past medical expenses associated with the accident in the amount of $14,357.11 and prayed for $100,000.00 in general damages. However, due to the pre-trial stipulation, Plaintiff limited her damages to a total of $40,000.00, the combined limits of the State Farm policies in question.

The trial court rendered extensive written reasons, finding as follows with regard to the movements of the motorists:

> On May 25, 2017, Kayla Landry was traveling southbound on Highway 26 in Jennings, Louisiana and driving a 2011 Chevrolet Malibu. Grant Racca was traveling northbound on that same highway in Jennings, Louisiana and driving a 2015 Ford F-350. Grant Racca approached the intersection of Highway 26 and Holiday Drive in Jennings. The intersection was controlled by a traffic light. Grant Racca made a left-hand turn at the intersection with the green circle light signal. Grant did not have the green arrow.
>
> Grant Racca was traveling northbound on Highway 26 and Kayla Landry was traveling southbound on Highway 26, and Grant stopped short of the intersection behind a truck that towed a trailer. When Grant Racca observed the truck and trailer move forward and turn left in front of him, he started to make the left turn. Approximately at the same time, the vehicle driven by Kayla Landry approached the intersection and

proceeded through the intersection while a yellow light was displayed. Both drivers attempted to swerve but were unable to avoid the collision. Grant did not yield the roadway to Kayla Landry at the Highway 26 and Holiday Drive intersection, and he collided with the 2011 Chevrolet Malibu operated by Kayla Landry.

As Grant Racca approached the intersection of this crash, he observed the traffic control device presented an illuminated green circle light. Grant Racca did not have the green arrow prior to the crash. Therefore, he should have yielded the right of way to Kayla Landry at the intersection before he attempted to make his right-hand turn. His failure to do so was negligent and is a fault that caused this collision, and he is therefore liable for the damages that resulted from this crash.

As for Plaintiff's comparative fault, the trial court stated:

Kayla Landry's failure to exercise caution in response to the yellow light was also fault, and because that fault contributed to Grant Racca's fault in the causation of this collision, it amounted to comparative negligence in the amount of 25 percent (25%). Grant Racca's proportion of the fault that caused this collision was 75 percent (75%).

Finally, in concluding that Plaintiff failed to prove causation of her alleged injuries,

the trial court remarked:

Kayla Landry is not an accurate historian. Kayla Landry has sustained a torn rotator cuff and superior glenoid labrum lesion in her right shoulder. Her failure to accept the surgical repair of this condition has caused this injury to increase in severity.

. . . .

Kayla Landry's treating physician[s], Dr. Paul Fenn, Dr. Joel Conner, and Dr. Lawrence Weber[5] have testified that this May 25,

---

[5] Plaintiff visited Dr. Lawrence Weber for her own choice of orthopedic Second Medical Opinion on June 15, 2021, four months before trial. Dr. Weber's resulting report indicated that Plaintiff continued to complain of "ongoing pain and disability to the right shoulder since her motor vehicle accident without prior right shoulder pain." Plaintiff indicated to Dr. Weber that she "has right shoulder pain described as a dull ache at rest and becomes a sharp shooting pain with any resisted shoulder flexion, extension, and/or abduction." Although Plaintiff described her pain to Dr. Weber as "a 0 out of 10 with rest[,]" her pain would "reach up to a level of 8 out of 10 with the described resisted motion[,]" and would be "8 out of 10 with any overhead activity and/or weightbearing." Dr. Weber agreed with Dr. Fenn's recommended treatment.

Dr. Weber's deposition was also introduced into evidence, as referenced by the trial court in its ruling on the issue of causation. When questioned whether he was "able to reach any conclusion as to whether or not … Ms. Landry sustained any shoulder - - right shoulder injury in this May 25, 2017 crash[,]" Dr. Weber replied: "Yes. I believe based on everything that you

2017, motor vehicle crash caused injury to Ms. Landry's right shoulder. Dr. Paul Fenn recommends Ms. Landry undergo arthroscopic surgery to repair the torn rotator cuff and labral tearing revealed by the images produced by Southwest Louisiana Imaging on January 4, 2018.

. . . .

However, the testimony regarding the mechanism of injury is speculative and while within the realm of the possible, it was not proven by a preponderance of the evidence. Ms. Landry reported she had no injuries on the date of this collision and did so again five days later. Subsequently, she reported that she did injure her right shoulder in this collision.

Kayla Landry's treating physician[s], Dr. Paul Fenn, Dr. Joel Conner, and Dr. Lawrence Weber, all base their opinions as to causation on the history Kayla Landry reported to them. Dr. Paul Fenn testified Ms. Landry had a preexisting diabetic condition that caused nerve damage that impeded her capacity to feel pain. He believed she is truthful, and this diabetic condition explains her inconsistent reports of injury. However, he also testified that the kind of injuries that Ms. Landry sustained often have an unknown etiology.

Unfortunately, for the plaintiff, this court finds her multiple and inconsistent reports of injury are bizarre and unreconcilable, and as a result she failed to prove that her current condition was caused by the defendant's actions.

Accordingly, the resulting judgment reflected the trial court's apportionment of 25% fault to Plaintiff due to her failure to exercise caution in response to the yellow light. The trial court rejected Plaintiff's claim for damages due to its finding that Plaintiff failed to prove causation. The trial court assessed all costs to Plaintiff.

Given its determination that Plaintiff failed to prove medical causation for her alleged injuries, the trial court rendered judgment determining that "neither Grant

---

mentioned, plus my questions to her about the timeline of the accident and her symptoms, that it's more probable than not that the injury that she has was from the car accident of 2017." In subsequent questioning, Dr. Weber acknowledged his "opinion of medical causation" was based on Plaintiff's history as reported by her. He credited much of Plaintiff's failure to recall a more specific mechanism of injury to the trauma of the event. When asked about Plaintiff's failure to report injury to State Farm five days after the accident, Dr. Weber stated: "What I'm saying is it's more - - in my mind, it's more probable than not that she sustained a right shoulder injury in the car accident, and how people want to put everything together to make that happen is up to them."

Racca, [n]or any of these defendants are obligated to pay any money to Kayla Landry." The trial court assessed costs to Plaintiff.

## ASSIGNMENTS OF ERROR

Plaintiff appeals, assigning the following as error:

1. The trial court committed legal error by misinterpreting the clear language of La. R.S. 32:232 and allocating twenty-five percent of fault to Plaintiff, where there is no evidence that Plaintiff committed any violation of the statute;

2. Alternatively, the trial court was clearly wrong in finding any fault on the part of Plaintiff, where there is no reasonable, factual basis for such finding and the record shows that that finding is clearly wrong in light of the fact that Defendant failed to discharge his presumed liability as a left-turning motorist; and

3. The trial court was manifestly erroneous in ignoring ample objective medical evidence that Plaintiff's right shoulder rotator cuff tear was caused by the May 25, 2017, crash; and

4. The trial court was in error in taxing costs to Plaintiff.

## LAW AND DISCUSSION

*Apportionment of Fault*

In her first two assignments of error, Plaintiff argues that the trial court erred in assessing her with any fault in the accident. She contends that the error stems from the trial court's "misapplication" of La.R.S. 32:232, which relates to traffic control signals. She suggests that the trial court's reliance thereon in assessing her with *any* fault constituted legal error so as to require this court to perform a *de novo* review of fault on appeal. Plaintiff alternatively asserts that the trial court manifestly erred in its assessment of 25% fault to her. Following review, we find the trial judge's ruling was within his discretion and is not manifestly erroneous.

An assessment of fault, or lack thereof, is reviewed pursuant to the manifest error standard of review. *See, e.g.*, *Hankton v. State*, 20-462 (La. 12/11/20), 315

So.3d 1278. The supreme court has additionally explained that a trier of fact is owed a degree of deference in its allocation of fault as a finding of a percentage of fault is a factual determination. *Foley v. Entergy La., Inc.*, 06-983 (La. 11/29/06), 946 So.2d 144 (quoting *Duncan v. Kansas City So. Ry. Co.*, 00-66, p. 10 (La. 10/30/00), 773 So.2d 670, 680). "'Therefore, an appellate should only disturb the trier of fact's allocation of fault when it is clearly wrong or manifestly erroneous.'" *Id.* at 165 (quoting *Duncan*, 773 So.2d at 680). *See also Hebert v. Rapides Par. Police Jury*, 06-2001 (La. 4/11/07), 974 So.2d 635.

In assessing whether a trial court was clearly wrong in allocating fault, the appellate court is "guided" by the factors of *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So.2d 967 (La.1985). *Foley*, 946 so.2d 144. Those factors, the supreme court explained, may include:

> (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.

*Watson*, 469 So.2d at 974. In the event the appellate court determines that the apportionment of fault is clearly wrong, it must then lower or raise it to the highest/lowest point which is reasonably within the trial court's discretion. *Id.*

Plaintiff argues that "the record is devoid of any facts or evidence" establishing that she was "negligent in any way." In particular, she asserts that the trial court erred in misapplying La.R.S. 32:232, as it applies to traffic signals, and maintains her trial position that the traffic signal facing her was green when she entered the intersection and that it turned yellow while she was in the intersection.

Given that circumstance—and the unquestioned fact that Grant made a left turn under the green circle light—she contends that full fault should be apportioned to Grant as he had a duty to yield the right-of-way to her.  Plaintiff pointedly questions the trial court's determination that she failed to exercise "caution in response to the yellow light" and maintains that such a duty is not required by La.R.S. 32:232(2)(a).

However, despite the trial court's specific referral to an exercise of caution in response to a yellow traffic signal, it is important to remember appellate courts review judgments, not a trial court's reasons for judgment. *See Wooley v. Lucksinger*, 09-571 (La. 4/1/11), 61 So.3d 507.

Further, "[a]ll motorists owe a general duty to observe what should be observed." *Bernard v. BFI Waste Serv., LLC*, 20-636, p. 8 (La.App. 3 Cir. 7/21/21), 325 So.3d 415, 423 (citing *Lopez v. Cosey*, 16-812, 16-813 (La.App. 1 Cir. 2/17/17), 214 So.3d 18), *writ denied*, 21-1271 (La. 11/17/21), 327 So.3d 995. Pursuant to La.R.S. 32:58, "[a] motorist has a duty to drive in a careful and prudent manner, so as not to endanger the life, limb, or property of any person." *Id.*  "Additional duties also arise depending on the motorist's movements on the roadway in relation to other vehicles." *Id.* at 423-24 (citing *ES v. Thomas*, 17-1213 (La.App. 1 Cir. 5/31/19), 278 So.3d 982).

In this case, the "additional duties" referenced in *Bernard* are reflected, in part, by La.R.S. 32:232, which relates to traffic-control signals and provides, in pertinent part:

> [1](a) Vehicular traffic facing a **circular green signal** may proceed straight through or turn right or left unless a sign at such place prohibits either such turn. But vehicular traffic, including vehicles turning right or left, shall stop and yield the right-of-way to other vehicles and to pedestrians lawfully within the intersection or an adjacent crosswalk at the time such signal is exhibited.

. . . .

> [2](a) Vehicular traffic facing a **steady yellow signal alone** is thereby warned that the related green signal is being terminated or that a red signal will be exhibited immediately thereafter and such vehicular traffic shall not enter the intersection when the red signal is exhibited.

(Emphasis added.)

Importantly, Grant's failure to yield the right-of-way is unquestioned, resulting in the obvious assessment of the lion's share of the fault against him. *See, e.g.,* La.R.S. 32:232; La.R.S. 32:122 ("The driver of a vehicle within an intersection intending to turn to the left shall yield the right of way to all vehicles approaching from the opposite direction which are within the intersection or so close thereto as to constitute an immediate hazard.") State Farm does not challenge that finding, and we do not revisit it here.

Further, Plaintiff correctly identifies that La.R.S. 32:232(2)(a) does not, alone, point to her negligence in proceeding through the intersection under a yellow light, whether it was yellow upon entering or whether it turned yellow after she entered the intersection. It should not go unrecognized, however, that by its choice of wording in La.R.S. 32:232(2)(a), the legislature "warned" drivers facing a yellow light that the red signal light is imminent.

Additionally, and in contravention of Plaintiff's claim that the trial court legally erred in finding her at fault to *any degree*, La.R.S. 32:232(2)(a)'s "warning" goes hand-in-glove with a motorist's general obligation to "observe what should be observed" and "to drive in a careful and prudent manner, so as not to endanger life, limb, or property of any person." *Bernard*, 325 So.3d at 423.

Furthermore,

> [a]ll motorists on Louisiana highways must drive with due regard for the traffic on the highway and have an affirmative duty not to drive

13

faster than is reasonable and prudent under the conditions and potential hazards existing at the time. La.R.S. 32:64(A) [6] [.] Thus, notwithstanding the presumption of negligence attributed to a left-turning driver, **a favored motorist can still be assessed with comparative fault if her substandard conduct contributed to the cause of the accident**.

*Baker v. State Farm Mut. Auto. Ins. Co.*, 49,468, pp. 6-7 (La.App. 2 Cir. 1/21/15), 162 So.3d 405, 410 (emphasis added) (case citations omitted).

For instance, in *Leonard v. Lee*, 49,669 (La.App. 2 Cir. 4/29/15), 165 So.3d 1083, the second circuit set aside a trial court's assessment of 100% fault in an intersectional collision to a left-turning driver and reduced that fault by 50%. It allocated the remaining fault to the oncoming, favored driver who entered the intersection under a green light. The panel explained that "[b]oth drivers should have seen each other; both drivers could have easily avoided this wreck." *Id.* at 1092.

The reasoning of *Leonard* is likewise applicable in review of the trial court's allocation of 25% of the fault to Plaintiff. That assessment was made following the trial court's viewing of surveillance footage of the accident. Although the surveillance footage shows Plaintiff's vehicle only after it enters the intersection and does not show the southbound traffic lanes adjacent to Plaintiff, the trial court heard Grant explain that other southbound vehicles had stopped at the light, and that a truck and trailer in front of him had executed a left turn across the southbound lanes of traffic. Although Grant saw Plaintiff's vehicle "a little further still behind the cars that were stopped at the stoplight[,]" he felt that he could safely complete his left

---

[6] Louisiana Revised Statutes La.R.S. 32:64(A) provides:

No person shall drive a vehicle on the highway within this state at a speed greater than is reasonable and prudent under the conditions and potential hazards then existing, having due regard for the traffic on, and the surface and width of, the highway, and the condition of the weather, and in no event at a speed in excess of the maximum speeds established by this Chapter or regulation of the department made pursuant thereto.

turn because "the other vehicles were stopped" and that he thought Plaintiff would stop as well.

Plaintiff obviously did not stop, and the accident followed. While Grant acknowledged that he proceeded under the green circle light, the remaining circumstances as explained by him support the trial court's finding. In particular, Plaintiff proceeded into the intersection without any indication in the record that she slowed her vehicle when she encountered the left turning truck and trailer that immediately preceded Grant into the intersection. Plaintiff instead gave no indication of having seen the truck and trailer, nor did she see Grant's truck until she was inside of the intersection, explaining that:

> I was heading south going through - - through the intersection, and the light had turned yellow, and I just kept going. And then all of a sudden, out of the corner of my eye, I seen something coming, a big white thing, and it was a truck, and it hit me. And then it - - we - - we both veered off into the Shop Rite.

On subsequent questioning by the trial court, Plaintiff stated that: "As I was going through the intersection, the light turned yellow, and I seen at the corner of my eye something was coming." As in *Leonard*, 165 So.3d at 1093, "[b]oth drivers should have seen each other; both drivers could have easily avoided this wreck." In the present situation, Plaintiff failed to slow her speed in entering the intersection in response to the changing yellow light, the left turning truck and trailer, and/or Grant's entry into the intersection. Those circumstances support the trial court's ruling.

Finally, we note that Plaintiff references *Thompson v. Cagle*, 15-416 (La.App. 3 Cir. 11/25/15) (unpublished opinion)(2015 WL 7573234), *writ denied*, 15-2358 (La. 2/19/16), 187 So.3d 461, in support of her argument that she should be assessed with no fault as the favored motorist. Plaintiff correctly observes that the panel in

15

*Thompson* explained in part that "[a] favored motorist travelling through an intersection controlled by a traffic signal is not obligated to look to his left or right before entering the intersection, but must maintain general observation of a controlled intersection." *Id.* at 6. Furthermore, a "favored motorist will be held accountable for an accident only if he could have avoided the accident with the exercise of the slightest degree of care and fails to do so." *Id.* (citing *Bernard*, 735 So.2d 804).

In *Thompson*, however, the panel *affirmed* a jury's allocation of 100% fault to a left turning motorist when the favored driver proceeded into the intersection without seeing the left-turning vehicle until after impact. The panel remarked, however, that the accident occurred at night and that the record did not contain evidence "that requires a finding that, under the circumstances" the favored driver "should have been able to see" the left-turning motorist "prior to impact, or that he could have taken steps to avoid the accident but failed to do so." *Id.* at 7. Considering those circumstances, the panel explained, the jury's finding was "reasonably supported by the record." *Id.* Plaintiff in this case, however, asks for a reversal of the trial court's finding. As we have found that the facts and circumstances of this case support the trial court's apportionment of fault, we find that the trial court's findings of fact, application of the law, and apportionment of fault are within his discretion.

### Causation of Injury

Plaintiff further challenges the trial court's determination that she failed to prove that her torn right rotator cuff was caused by the accident. She contends that although the trial court acknowledged her injury "and its acceptance of the testimony of her treating physicians that this crash caused her rotator cuff injury, the trial court

improperly gave undue consideration" to her "credibility over that of the unrefuted, objective medical evidence and testimony presented." As explained below, we find merit in this position. Plaintiff's testimony, witnesses, and medical evidence, especially as interpretated by Dr. Fenn at trial, reveals clear error in the trial court's denial of damages.

As a starting point, it is clear that Plaintiff was required to bear the "'burden of proving a causal relationship between the injury sustained and the accident which caused the injury[,]'" and to do so by a preponderance of the evidence. *Taylor v. City of Alexandria*, 19-25, p. 9 (La.App. 3 Cir. 6/5/19), 274 So.3d 206, 214 (quoting *Maranto v. Goodyear Tire & Rubber Co.*, 94-2603, 94-2615, p. 3 (La. 2/20/95), 650 So.2d 757, 759). "'The test for determining the causal relationship between the accident and subsequent injury is whether the plaintiff proved through medical testimony that it is more probable than not that the subsequent injuries were caused by the accident.'" *Id*. (quoting *Maranto*, 650 So.2d at 759). Accordingly, an appellate court considers the plaintiff's "objective medical evidence ... *along with the testimony presented at trial*, to determine whether the trial court committed manifest error" in its determination as to whether a plaintiff's injuries were caused by the subject accident. *Taylor*, 374 So.3d at 214 (emphasis added).

Given that standard, we find that the trial court manifestly erred in failing to account for Dr. Fenn's uncontroverted trial testimony regarding the accident's causation of Plaintiff's torn rotator cuff and failure to account for the additional medical and lay testimony supporting causation of Plaintiff's shoulder injury to the crash in question. The trial court's error is especially apparent in light of the corroborating lay witnesses as well as Dr. Conner's medical records, which reflect

17

Plaintiff's attribution of her shoulder pain to the accident, all discussed more fully below.

Foundationally, it is important to note that the trial court acknowledged Plaintiff's injury. The trial court's reasons, however, reflected its concern regarding Plaintiff's delayed reporting of her injury and pain progression to both State Farm and to her medical providers. With that concern in mind, the trial court found that medical testimony, namely that of treating physician Dr. Fenn and second medical opinion provider Dr. Duval, was equivocal and speculative as to causation of Plaintiff's torn rotator cuff.

The trial court's remarks as to equivocation on the issue of medical causation was primarily based upon deposition testimony from both Dr. Fenn and Dr. Duval indicating that a rotator cuff tear of such a magnitude as seen in Plaintiff's MRI should cause an immediate onset of pain and an inability to lift the arm. Moreover, the record reflects that Plaintiff did not begin seeking medical treatment until approximately two months after the accident and did not see her treating physician, Dr. Fenn, until five-months post-accident.

The trial court cited Plaintiff's delay in reporting her pain and injury in determining that Plaintiff's "inconsistent reports of injury are bizarre and unreconcilable[.]" Review of the record, however, undermines that determination and reveals that Plaintiff's hesitation in initially reporting injury was due to her failure to equate the "soreness" she was experiencing with the type of "injury" she was being asked about. Plaintiff testified that when she denied "injury" to State Farm five days after the accident, she had not yet been to the doctor and had not been diagnosed with an injury. She felt, instead, that her condition would resolve and that the type of soreness she was experiencing, a pain level of ten (10) out of ten (10) on

18

the evening of the accident, was typical following an automobile accident of this severity.[7]

Plaintiff's testimony regarding her immediate onset of pain post-accident was corroborated by her friend, Mistie Landry, who was called to the accident scene and who took Plaintiff home afterward. Mistie testified that Plaintiff appeared to be "kind of shooken up" at the scene. When asked whether Plaintiff had "any pain from the crash[,]" Mistie explained, "That night she said that her arm was hurting her, but that's all that she told me." Mistie further stated that, after the accident, Plaintiff "complains of her, like, arm/shoulder hurting more" and that her activities had been curtailed. Asked if she had observed Plaintiff have issues with her right shoulder before the crash, Mistie responded, "Not that I know of."

On cross-examination, Mistie again testified regarding Plaintiff's pain immediately following the accident and explained, "She told me that night that it was - - like, it was bothering her. It was hurting her." When counsel for State Farm asked Mistie whether she spoke with Plaintiff "about her right shoulder after that first day[,]" Mistie replied, "I mean, she would tell me every once in a while that her shoulder, you know, was bothering her or something." Mistie explained that she did not know why Plaintiff would have denied injury in her State Farm statement five days after the accident or whether Plaintiff encountered difficulties at work. When asked about Plaintiff's abilities at the time of trial, Mistie stated that:

> Like I said, she tells me that her shoulder hurts. I mean, there's - - like, with my - - our main thing is, like, with my son going fishing, you know, like, she says that it bothers her; that she can't fish with him

---

[7] Plaintiff's testimony and photographic evidence demonstrate that Plaintiff's vehicle sustained damage to the front driver's side quarter panel and the driver's side door, requiring Plaintiff to exit the vehicle via the passenger's side. The vehicle was rendered inoperable and had to be towed from the scene.

like she used to, so that's from - - you know, that's what I know, but that's it.

Like Mistie, Plaintiff's friend and co-worker Kimberly Lessigne testified regarding Plaintiff's reporting of pain immediately following the accident and thereafter. Ms. Lessigne explained that she had known Plaintiff for approximately twenty-five years as a family and personal friend. Additionally, Ms. Lessigne worked with Plaintiff at Butchie's Corner. When asked if she had observed Plaintiff having right shoulder problems before the accident, Ms. Lessigne responded that she could not recall any but that, "I remember her taking care of my kids, doing normal things, lifting on things. I don't really remember her having any trouble to my knowledge." Ms. Lessigne stated that she first learned of the subject accident within "probably a couple of days to a week after." Although Ms. Lessigne could not recall "exactly when[,]" she stated that she knew "it was when [Plaintiff] next came to work and we worked together, and she complained about her arm hurting." When asked whether she observed Plaintiff "have any issues with her right shoulder after this crash[,]" Ms. Lessigne replied:

> [Y]es, at work. As you know, we worked together at Butchie's Corner, and it's a convenience store, so we have snow cones, and the snow cones are on the shelves, so, you know, **you'd have to reach up to grab the snow cones, and she couldn't do that**. You have these big 'ole blocks of ice that you got to put in the machine. Our machine that is our coke machine, you have to lift off the lid, and we don't have self-making ice, so you got to get bags of ice, crush them up, and then put them into the machine. Mopping. And we have a cooler where you have crates of Dr. Peppers, waters, drinks that you'd have to move off of each other to restock the shelves. **So I know it was hard for her. She couldn't - - she could barely lift her arm. So she'd either have to do it with her left hand or she actually had to get a different job that she could do, and then we'd switch jobs so that she didn't have to do that**.
>
> We also sell Hunt Brothers pizza, and so when the pizzas come out, you know, you got to - - our - - our machine's up, so you got to put the cardboard underneath the pizza to take it out.

Q      Uh – huh (yes).

Was she doing those things before the May 25th, 2017, crash?

A      Yes.

Q      And did she have any issue completing those tasks before this crash?

A      Nope.

Q      Okay.

A      No, sir.

Q      And what about after?

A      Yes, **it was hard for her to lift her arm 'cause it hurt**, so we had to switch around our jobs to where she could do jobs that didn't require her lifting her arm, so - - I mean, or **she'd have to do it with her left arm**.  **But I don't know about you but it's kind of hard to do things with your left arm when you're not used to it**.

. . . .

Q      Is there any other things that you observed after this crash that were different compared to before this crash?

A      After the crash?

Q      (Nods head affirmatively.)

A      **Just everyday things were harder**.  I mean, we hung out a lot. I mean, she was with me when I found out I was expecting my first child.  So, I mean, we - - **we hung out a lot**.

Q      Okay.

A      Going to the grocery store, you know, having to carry hard bags - - you know, plastic bags.  You know, she'd have to carry on that side. We used to be able to go to the park with my kids - - and not that we can't go to the park, but, I mean, you know, she wouldn't be able to do the same things that she did before with kids.

(Emphasis added.)

21

Plaintiff's immediate return to work, although she claimed she did so in pain as corroborated by Mistie Landry and Kimberly Lessigne, highlights a flawed position maintained by State Farm and seemingly adopted by the trial court. State Farm notes that its IME Orthopedist, Dr. Duval, and to a lesser extent Dr. Fenn, testified in their depositions regarding the profound nature of the injury to Plaintiff's rotator cuff and **the typical inability to lift the arm upon sustaining such an injury**. State Farm suggests that had the accident caused such an injury, Plaintiff would have immediately evidenced such an inability.

The objective evidence, Plaintiff's testimony, and corroborating lay testimony, however, undermines State Farm's attempt to draw such a bright line of causation and, to the extent it accepted State Farm's position, the trial court manifestly erred.

Instead, several things are patently obvious—and without contest—on this record. First, Plaintiff had no prior complaints of injury to her right arm or shoulder prior to this accident, which resulted in sufficient damage to the driver's side to render the vehicle inoperable. Additionally, as of January 2018, Plaintiff demonstrated a massive tear to the right rotator cuff, *and* yet she *continued to work and function*, albeit in pain and with some limitations. The record indicates that the day following the accident, Plaintiff returned to work at Butchie's Corner and continued to work there for a bit. As indicated infra, Plaintiff reported pain to Ms. Lessigne, she required assistance with lifting items, and she could not lift overhead items, but she was able to function, albeit in pain. Plaintiff ultimately left Butchie's Corner for other employment. She continued to try to work to the best of her ability.

Plaintiff worked for a period at Henry's Dairy Barn, where she was assigned to the kitchen. Coincidentally, testimony at trial indicated that Henry's Dairy Barn is owned by Defendant Kendall Henry, Grant's mother. Ms. Henry testified that

22

Plaintiff was a "great worker."[8] At the time of trial, Plaintiff was working as a food delivery driver. Again, despite the objective evidence of Plaintiff's torn rotator cuff, Plaintiff was able to work, albeit in pain, including problems using her right arm. She required assistance with certain tasks. Plaintiff confirmed that she continued to work as best she could, but that any lifting of the arm exacerbated her symptoms.

Especially important to Dr. Fenn's trial testimony, Ms. Henry explained that the only health "issue" voiced by Plaintiff was related to her development of diabetic foot ulcers. Plaintiff was absent from work in order to recover from the ulcers. While Plaintiff's diabetic condition was known throughout the litigation as evidenced in her medical history, Dr. Fenn, who testified at trial *after* Ms. Henry, explained that the fact that Plaintiff's diabetic condition had progressed to the point that she suffered from foot ulcers was important. In fact, Dr. Fenn's trial testimony provides the primary basis for our finding of manifest error in the trial court's judgment regarding medical causation.

On this point, Dr. Fenn explained in his in-person testimony at trial that he found Ms. Henry's information regarding the advanced state of Plaintiff's diabetic condition informative and the likely reason for Plaintiff's "inconsistent" reports of pain, despite the massive tear to the rotator cuff.

---

[8] Ms. Henry testified that she did not see Plaintiff have difficulty completing her work tasks during the period she was employed at Henry's Dairy Barn. Ms. Henry explained that she had even seen Plaintiff use her right arm to use the meat slicer. However, in his subsequent trial testimony, Dr. Fenn discounted Ms. Henry's testimony in that regard noting that Plaintiff's injury would not prevent her from "pushing and pulling" as required by the slicer, but that the problem associated with Plaintiff's injury "is elevating the arm and bringing it up over the head." Dr. Fenn's testimony is supported by Plaintiff's testimony that any such upward lifting immediately exacerbated her pain.

When Plaintiff's counsel inquired why Plaintiff had reported "difficulty lifting heavy objects" to both Dr. Fenn and Dr. Conner, Dr. Fenn replied:

> Well, in - - in sitting through a lot of this testimony, I understand some of the confusion in terms of severity. I think the most significant thing that I - - I just picked up on sitting here was the last person who testified [Ms. Henry] - - and I - - and she actually hadn't even told me this - - mentioned that she had been treating for diabetic ulcers, and what's **significant in this setting is that diabetic patients don't feel pain in the same way other patients do**. So - - and - - and I didn't realize her pathology was to the extent that she's already progressed to having ulcerations. We didn't discuss that. We were discussing upper extremities.
>
> So what I'm listening to and what I'm hearing is a patient who's got sort of this unclear complaint of pain, and from a - - **a legal purpose and a court purpose, we're trying to really hone down on it, but she - - she just can't do that, and that's not uncommon in diabetic patients. Getting history from diabetics can be a challenge just in general**.
>
> **So everything that I've been hearing is consistent with that now, and the icing on the cake for me was her nerves had degenerated to the point that she can walk and get an ulcer on her foot 'cause what happens is the patient - - the reason that happens is 'cause you don't feel**. Diabetes is vicious. It takes out the nerves. It takes out the vessels. So patients can have heart attacks and not know it. **They can have pain, but it can be muted. So all of that's consistent with what I've been hearing from this patient, and now that actually kind of puts it even clearer for me from the medical side**.
>
> So all of these complaints that she's had makes sense, and then as she would start to try and do certain activities - - well, **if she's got a partial rotator cuff tear, overhead is going to be the thing that really triggers that. And she's been pretty consistent where overhead activity is something that she is going to struggle with**, and so - - so from my standpoint, the history makes sense.

(Emphasis added.)

24

At the close of Dr. Fenn's testimony, after he attributed causation of the injury to the May 25, 2017 accident, he answered follow up questioning by Plaintiff's counsel:

> Q    Have Ms. Landry's subjective complaints to you been medically consistent with your objective findings?
>
> A    **Yes.  Again, I think her - - the - - the discrepancies in the things that we've sort of been dis - - - I've observed being discussed here today are consistent with obtaining history from diabetic patients, and she's, to the best of her ability, been honest and just trying to explain what it is she's feeling**.

(Emphasis added.)

The trial court accounted for Dr. Fenn's trial testimony only in passing, cursorily stating that Dr. Fenn testified that "Ms. Landry had a preexisting diabetic condition that caused nerve damage that impeded her capacity to feel pain."  Dr. Fenn clearly explained that Plaintiff's testimony and accounting of pain *is consistent* with her diabetic condition.  Dr. Fenn's testimony is uncontradicted in that regard as no other physician spoke to how Plaintiff's condition may have affected her reaction to her objectively identified condition.

It is noteworthy that Dr. Fenn, as Plaintiff's treating physician, was entitled to have his testimony afforded "'more weight than that of a doctor who examines a claimant for diagnostic purposes only[.]'" *Jones v. Progressive Sec. Ins. Co.*, 16-463, p. 6 (La.App. 3 Cir. 12/29/16), 209 So.3d 912, 918 (quoting *Clark v. State Farm Ins. Co.*, 520 So.2d 860, 864 (La.App. 3 Cir. 1987).  Given that principle, and the uncontradicted nature of Dr. Fenn's testimony, as supported by the lay testimony, we find that the trial court manifestly erred in failing to give appropriate weight to the treating physician's testimony on this all-important issue.

Thereafter, the trial court again failed to adequately consider the specifics of Dr. Fenn's testimony as it recognized only Dr. Fenn's abstract acknowledgment that "the kind of injuries that Ms. Landry sustained often have an unknown etiology." The trial court neither addressed nor acknowledged Dr. Fenn's specific statement as to causation *of Plaintiff's injury* within the confines of *this case*. When pointedly asked, "**Do you believe more probably than not that Ms. Landry's right shoulder injury was caused by this May 25th, 2017, motor vehicle crash**[,]" Dr. Fenn unequivocally stated, "**Yes**." (Emphasis added.)

Further, to the extent Dr. Duval, State Farm's IME doctor, negated Plaintiff's theory of causation in his own deposition, he was not privy to the information regarding Plaintiff's advanced diabetic condition as developed at trial and hence did not offer an opinion regarding how that condition could have influenced Plaintiff's perception of her injury. Likewise, he was not present at trial and hence was not privy to the corroborating lay testimony from Plaintiff's friend, Misti Landry, and her co-worker, Kimberly Lessigne. Dr. Fenn's testimony on that point was therefore unchallenged in the record. We find manifest error in the trial court's failure to account for Dr. Fenn's uncontradicted testimony as Plaintiff's treating physician, as corroborated by Plaintiff's uncontradicted testimony and that of Plaintiff's lay witnesses.

In reaching this conclusion, we took into account State Farm's further reference of Plaintiff's alleged inconsistent reporting of the timeline associated with her visits to health care providers, as well as the number of visits. That "evidence" of purported credibility impeachment is reflected in the trial court's findings. However, the subject accident and much of the care rendered in this case occurred well over four years before trial. Additionally, we find that Plaintiff's alleged

26

"inconsistent reporting" was not impeaching testimony per se, but, after reviewing the record in its entirety, we find that it simply reveals that Plaintiff was a poor historian who did not have a sophisticated understanding of the terms of art associated with a claim for injuries. We note that Plaintiff did not rush to a law office immediately following her injury. In fact, Plaintiff initially denied injury at the time of the accident as well as in her recorded statement to State Farm. However, she testified at trial that she felt "sore" the night of the accident and that it became exacerbated that evening to a pain scale of ten (10), and although her pain continued, she continued to work as best she could, albeit in pain and with certain limitations. Plaintiff did not equate her complaint to the type of "injury" she was being asked about. She testified that she was concerned about getting to and from work given her nonoperational vehicle and her need to maintain employment. She explained that she felt that her condition would improve. It, of course, did not, as evidenced in her ultimate resort to medical care from Dr. Fenn.

In contrast to the trial court's finding of inconsistency, Plaintiffs' testimony is substantiated by her medical records. Plaintiff explained that she was "sore" after the accident, and in her statements to State Farm and the investigating officer, she did not initially consider this "an injury." The following day at work, however, the pain was exacerbated with lifting. Upon rest, the pain would improve.

Plaintiff's ability to endure a level of pain that others may find intolerable is consistent throughout Plaintiff's medical records. The records of Dr. Connor and Dr. Fenn clearly include reports of pain and exacerbation of that pain with lifting.[9]

---

[9] For instance, Plaintiff's first sought medical assistance from Dr. Connor on July 26, 2017, two months after the subject accident. Plaintiff completed the "New Patient Health History Form" and reported "Automobile" as the "Nature of Injury" and described her "Current Complaints" as "My right shoulder hurts when I pick up something heavy[.]"

Plaintiff continually attributed the onset of her shoulder pain on lifting to the occurrence of the May 25, 2017 accident. At no time did Plaintiff waiver or report an improvement of her condition.

While the parties argue in their briefs as to the applicability of the presumption of causation provided by *Housley v. Cerise*, 579 So.2d 973 (La.1991),[10] given the immediate onset of Plaintiff's symptoms, or lack thereof, we find the applicability of that presumption immaterial. Rather, the record reveals that the trial court manifestly erred in its failure to account for the uncontradicted trial testimony of Plaintiff's treating physician, Dr. Fenn, as to causation as his opinion was informed at trial due to developing details of the severity of Plaintiff's diabetic condition. And, to the extent the trial court may have relied on Dr. Duval's statement that Plaintiff's injury would have caused immediate inability to lift the arm, that view is simply and directly contradicted by the objective evidentiary fact that Plaintiff demonstrated a torn rotator cuff on the MRI on January 4, 2018, yet she has continued to function at her various jobs, albeit in pain, especially on lifting her arm or lifting heavy objects.

Finally, the trial court remarked that Plaintiff's injury had progressed due to her failure to avail herself of medical care earlier. Dr. Fenn explained that in

Similarly, Dr. Fenn's notes from Plaintiff's first visit of October 26, 2017 indicate that Plaintiff reported "a motor vehicle accident in February of 2017 [sic]" and that "[s]he noted gradually increasing pain in the right shoulder after the MVA." At the time of the appointment, "she complain[ed] of mild to moderate pain to the lateral shoulder extending down over the trapezious" and "note[d] pain and difficulty with overheads." Plaintiff further "note[d] weakness in the arm, pain with lifting objects as well as popping with motion. She denie[d] any stiffness. She denie[d] any prior history of right shoulder complaints."

[10] The supreme court explained in *Housley* that "'[a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.'" *Id.* at 980 (quoting *Lukas v. Ins. Co. of N. Am.*, 342 So.2d 591, 596 (La.1977)). Although the presumption initially arose within a workers' compensation context, the supreme court applied the underlying principle in the personal injury matter before it in *Housley*.

28

reference to his review of Plaintiff's medical records, at least by her January 17, 2019 visit at which the MRI report was read, her "kind of progression" in complaints of pain/weakness is what one would expect given the findings. State Farm cannot now claim that Plaintiff is unable to recover for its insured's liability merely because Plaintiff's injury was not properly diagnosed until a period of time afterward. To suggest so would have required Plaintiff to immediately request costly diagnostic and surgical procedures. Plaintiff must not be penalized for attempting to manage her pain for two months before seeking medical intervention—particularly as State Farm contested liability and causation. By May 2018, at which time Plaintiff was actively seeking medical assistance, Plaintiff was required to file suit due to State Farm's denial of her claim. State Farm cannot now suggest that Plaintiff was recalcitrant for not immediately filing suit and/or moving forward with earlier, more aggressive treatment given State Farm's denial of responsibility for this claim.

Accordingly, finding manifest error in the trial court's ruling, we below enter judgment in favor of Plaintiff, awarding damages as proven and prayed for at trial for injuries associated with the May 25, 2017 accident for which State Farm provides liability and UM coverage. The evidence shows Plaintiff sustained damages in the amount of $624,607.11 ($14,357.11 in past medical expenses; $510,250.00 in future medical expenses; and $100,000.00 in general damages). After subtracting for Plaintiff's twenty-five (25%) percent comparative fault, she would be entitled to a judgment in the amount of $468,455.33. However, the parties entered into a pre-trial stipulation limiting recovery to the total amount of $40,000.00, that sum representing the policy limits of each of the applicable State Farm policies at issue. The judgment we render against State Farm reflects the limitation on the amount of both policies as stipulated to by the parties.

*Costs*

By her final assignment of error, Plaintiff seeks a reversal of the trial court's assignment of the costs of the proceedings below to her. Given our above findings in favor of Plaintiff, we hereby reverse the trial court's assignment of trial court costs and below render judgment assessing both trial court costs and those associated with Plaintiff's successful appeal to this court against State Farm.

## DECREE

For the foregoing reasons, we affirm the trial court's judgment in its apportionment of twenty-five percent (25%) of the fault to Plaintiff-Appellant Kayla Landry and seventy-five percent (75%) of the fault to Defendant-Appellant Grant Racca.

We find that Plaintiff-Appellant Kayla Landry proved medical causation by a preponderance of the evidence based on all the evidence, especially her testimony as corroborated by lay witnesses, and the testimony of her treating physician, Dr. Paul Fenn.

In light of the parties' Joint Stipulation limiting the amount in controversy, judgment is cast in favor of Plaintiff-Appellant Kayla Landry and against Defendant-Appellant State Farm Mutual Automobile Insurance Company in the amount of $40,000.00 ($25,000.00 provided by State Farm Policy Number 181-5520-B11-18E and $15,000.00 provided by State Farm Policy Number 293728918) as well as legal interest on that sum from date of judicial demand. All costs of this proceeding, both at the trial and the appellate level, are assessed to Defendant-Appellant State Farm Mutual Automobile Insurance Company.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**